NAPORANO IRON AND METAL COM-
PANY, Andrew J. Naporano & Beatrice
Naporano, Andrew J. Naporano &
Sharon Naporano, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 440–79T.

United States Claims Court.

Oct. 15, 1984.

Theodore L. Abeles, Newark, N.J., for plaintiffs. Paul Sandars, III, Newark, N.J., of counsel.

Mary M. Abate, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

TIDWELL, Judge:

This is a tax refund case wherein plaintiffs seek a refund of $459,623.65 plus statutory interest for taxes and assessed interest paid in the tax years 1974–1975. The dispute arises from defendant's actions in disallowing a $196,500 deduction by plaintiff corporation under section 162 of the Internal Revenue (IRC) for expenses allegedly paid as compensation for injuries and in settlement of a law suit and in charging the remaining plaintiffs with constructive dividends. Plaintiffs paid the additional taxes assessed by defendant for tax years 1974–75 and requested a refund from the Internal Revenue Service. Plaintiffs' request was denied and plaintiffs filed suit in this court seeking a refund. Trial was held on March 20, 1984. After careful review of the evidence presented at trial, the court finds that plaintiff corporation's $196,500 payment is properly deductible under section 162 IRC and that defendant erroneously charged the individual plaintiffs with constructive dividends. Therefore, plaintiffs are entitled to a refund of $459,623.65 for excess taxes and assessed interest paid and interest thereon as permitted by law.

## FACTS

Naporano Iron and Metal Company was founded in 1944 by plaintiff, Andrew Naporano, Sr., as a scrap iron business. In 1948 the company was incorporated under New Jersey law with ten shares of authorized stock. Initially, Andrew, Sr. held eight shares of stock; his brother, Aniello Naporano, held one share; and his father, Joseph Naporano, held one share. The company was operated as a closely held family corporation employing other family members, including Anthony Naporano, another of Andrew, Sr.'s brothers.

In 1962, Joseph Naporano transferred his one share of stock to his son, Anthony. All outstanding shares of stock were thus owned by the three brothers. During that same year the company's stock structure was recapitalized to provide for 500 shares of voting common stock and 4500 shares of non-voting preferred stock. As a result of the recapitalization Andrew, Sr. received 400 shares of common stock and 3600 shares of preferred, while Aniello and Anthony each received 50 shares of common and 450 shares of preferred stock. In 1963, 18 shares of preferred stock were transferred to Anthony D'Alessio, a brother-in-law of Andrew, Sr.[1]

In the early 1960's, Joseph Naporano (Joe), Andrew, Sr.'s oldest son, joined the company on a full-time basis after receiving a Bachelor's Degree in metallurgy and mining from the University of Colorado and a Master's Degree in Finance from Columbia University. Because of his excellent educational background and his interest in and knowledge of the business, Andrew, Sr. gradually turned over to him more and more of the executive and administrative duties of running the company. However, Andrew, Sr. continued working actively for the company throughout the years in issue. Andrew, Jr., another son,

---

1. At the time of the matters at issue, the ownership of stock in Naporano Iron and Metal Company was held as follows:

| NAME | COMMON STOCK | PREFERRED STOCK |
| --- | --- | --- |
| Andrew J. Naporano | 400 (held in voting trust by his son, Joseph) | 2,159–2,097 |
| Joseph F. Naporano | | 701–732 |
| Andrew J. Naporano, Jr. | | 701–732 |
| Anthony D'Alessio | | 18 |
| Anthony Naporano | 50–0 | 450–0 |
| Aniello Naporano | 50 | 471 |

began working for the company in 1971. The company steadily expanded over the years, growing from 15 employees in the early 1960's to around 100 in the early 1970's to nearly 200 in the early 1980's. The volume of business increased dramatically from 1973 to 1981 with gross receipts in 1973 totalling $4,907,022 and in 1981 totalling $20,230,520. The company's expansion was attributable, in part, to a radical change in the nature of the business, from that of principally buying and selling scrap metal, to that of dismantling and repairing railroad cars and locomotives nationwide, and smelting, selling and exporting aluminum and other non-ferrous metals.

The family members held various positions as officers and directors in the company over the years. Joe became President of the company in the late 1960's and Andrew, Jr. became Vice-president in 1972. During the years 1973 and 1974, Joe was, in addition to President of the company, the Chairman of its Board of Directors. On June 26, 1974, Andrew, Sr. and Andrew, Jr. were named members of the Board of Directors.

Anthony Naporano began working in the company in 1947 and in the years prior to 1974 he was plant superintendent.[2] For many years, Anthony Naporano had been a devisive element within the company and the family and was difficult to get along with. During the period of time when Joe was advancing within the company, Anthony caused problems for him and later for Andrew, Jr. in the course of fulfilling their duties. He also had a series of disputes with other family members, many of whom would not associate with him outside of work. Anthony also had a history of disputes with non-family employees and customers. This caused the company to lose several customers.

Because of the problems Anthony created within the company and with customers,

and because of his vociferous disagreement with Joe's programs for change and expansion, Joe believed that it was not in the best interests of Naporano Iron and Metal Company that Anthony remain with the company. However, Anthony's employment with the company was not terminated because of family considerations.

Anthony and Andrew, Jr. particularly did not get along. Anthony was jealous of Andrew, Jr.'s position and quick ascent in the company. Andrew, Jr. was hot-tempered and had a relatively large and strong physical stature as compared to Anthony who was rather frail. After Andrew, Jr. became Joe's assistant and liaison for plant operations, which occasioned direct contact with Anthony as plant superintendent, several minor incidents occurred. Despite the evidenced problems between Anthony and Andrew, Jr., Joe allowed for their continued physical proximity notwithstanding Anthony's evidenced jealousies and Andrew, Jr.'s aggressive physical nature.

On August 9, 1973, a dispute arose between Anthony and Andrew, Jr. while they were at work at the company plant. During the course of the dispute, Andrew, Jr. attacked Anthony, knocking him down and breaking his nose.[3] After administration of first aid, Anthony was immediately taken to a hospital for treatment. As a result of the altercation, Anthony sustained multiple fractures of his nose, and lacerations, abrasions and contusions of the face and scalp. Over the next year or so he was admitted to the hospital twice for surgical correction of the nasal fractures, and over a period of time incurred large bills for extensive medical treatments, including neurological and psychiatric treatments. On August 16, 1973, the company filed an injury report with the New Jersey Department of Labor and Industry and with its workmen's compensation carrier, New Jersey Manufacturer's Insurance Company.

2. As plant superintendent, Anthony received $37,500 in 1971 and 1972, $25,000 in 1973 and $13,500 through July 4, 1974.

3. Testimony indicated that Andrew, Jr. hit Anthony with a wrench, causing severe traumatic injury.

During August 1973 Anthony retained an attorney, Adrian M. Unger.[4] On August 24, 1974 Mr. Unger wrote to the company suggesting an "amicable resolution" of the August 9, 1973 incident and "other matters of mutual interest", and in the absence thereof, he threatened that his law firm would "take such action on behalf of our client as we deem necessary and proper".

On October 12, 1973, Mr. Unger wrote to the company's attorney, Joseph J. Biunno, Esquire, regarding the injury to Anthony. Mr. Unger alleged irregularities detrimental to Anthony's interests as a shareholder of the company, and requested an accounting and a review of the company records. These included stock books, financial statements, balance sheets, records of loans, payrolls, bonuses and payments over a ten year period. In the letter, Mr. Unger stated that he "trusts that Mr. Biunno's clients will consider making an amicable settlement in order to avoid what would be serious and meaningful litigation."

On October 16, 1973 Mr. Biunno wrote Mr. Unger that their discussions were without prejudice and that the materials requested were being assembled and that salary would be continued "to avoid adding fuel to an already overinflamed situation."

On December 14, 1973 Mr. Unger wrote Mr. Hoens, a partner in the company's law firm, indicating the receipt of certain documents requested, and inquired as to Anthony's 1973 bonus and sought additional company documents including information on profits and earnings and bonuses. On January 4, 1974 Mr. Unger wrote Mr. Hoens that Anthony required additional surgery and that "unless we received the remaining requested documentation and information by January 18 and a satisfactory offer and settlement by February 1, we shall file appropriate suits."

On January 14, 1974, Mr. Hoens wrote Mr. Unger, providing him with information relating to the records of the company, and stated that:

We will shortly be in a position to make an offer concerning the stock interest that Anthony Naporano holds in Naporano Iron & Metal Company. It is somewhat impossible for us to make any type of offer with respect to the alleged injuries suffered by Anthony Naporano until we are in possession of medical reports concerning the extent, value and permanency of the injuries. If you will submit the medical reports to us we will then be in a position to evaluate them for settlement purposes.

By letter of January 21, 1974 Mr. Unger wrote Mr. Hoens sending additional medical bills, an initial doctor's report and giving permission for Anthony to be examined by a doctor of the company's choice. By letters that followed Mr. Hoens arranged for Dr. Robert Akos to conduct the examination.

On February 6, 1974, after a number of letters from Mr. Unger to the company's attorneys suggesting that the company submit a settlement offer, and demanding further financial detail of dealings of Naporano Iron and Metal Company, and threatening "appropriate suits" by February 1 or February 16, 1974, Mr. Hoens wrote to Mr. Unger conveying the company's offer to buy Anthony's stock for a total amount of $87,000, its stated book value. The company, however, declined to discuss settlement with respect to the alleged injuries until Anthony had been evaluated further.

Mr. Unger responded, on February 8, 1974, that the $87,000, offer for the stock was "grossly inadequate," and that "with regard to the assault case, as indicated by previous correspondence, a substantial settlement offer must be made particularly in view of the aggravated nature of the assault and its present effects. The physical injuries are only an infinite part thereof." Throughout the exchange of correspondence between counsel, Anthony's attorney

4. Mr. Unger was called by plaintiff to show that he was deadly serious about the suits he subsequently filed and indicated that he was about to file. Counsel for plaintiff represented Mr. Unger as an aggressive and tenacious trial attorney which was supported by testimony.

consistently raised the threat of a law suit if a satisfactory settlement offer was not received.

On March 19, 1974, Dr. Akos reported in writing that he had examined Anthony and stated that he had suffered injuries to his nose, face and skull. Dr. Akos stated that Anthony had undergone a nasal operation and still had difficulty in breathing. Dr. Akos also reported that Anthony was tense and under stress and was under the care of a neurologist. On April 11, 1974 · Mr. Hoens provided a copy of Dr. Akos' report to Mr. Unger and requested copies of any neurologists' reports. On April 19, Mr. Hoens wrote Mr. Unger that they could not intelligently evaluate the claims until they had conducted a neurological examination and awaited the results of a prospective nose operation. He stated:

> While I do not mean to dissuade you from instituting suit if that is your pleasure, I must protest your use of deadlines to require us to respond with an offer of settlement when we do not have sufficient facts to intelligently evaluate a possible offer of settlement.

On May 25, 1974, Mr. Unger wrote to the company's attorney stating that he had decided to "put both matters in suit. Complaints are drawn and about to be filed." However, no law suit was filed at that time.

Throughout these negotiations, Anthony's medical bills were being paid by New Jersey Manufacturers Insurance Company, plaintiff company's workmen's compensation carrier, either directly or through reimbursement. In addition, the company continued to pay Anthony his regular weekly salary, although he had not returned to work since the date of the injury. On June 6, 1974, ·Colin M. Danzis wrote to Mr. Unger stating that he had become general counsel to the company following the death of Mr. Biunno, a senior partner in his firm. Mr. Danzis stated that he had recommended that the company terminate the weekly salary payments to Anthony since no reasonable counter-offer had been made

to the company's offer to buy Anthony's stock for $87,000.

Further negotiations between the parties ensued and in June of 1974, Anthony, through his counsel, made a demand for $500,000, "in settlement of all claims." The company countered with $175,000, to be paid out over 7 years which Mr. Unger rejected. A July 16 counter-proposal by Mr. Unger which would have amounted to total payments in excess of $1,000,000 (including an offer to sell his stock for its book value of $87,000) was rejected. The company's offer was formally withdrawn by Mr. Hoens on July 18, 1974. Mr. Hoens also informed Mr. Unger that Anthony's employment status with the company was terminated and that he would receive no more weekly salary checks.

The attorneys sparred back and forth for several days thereafter trying to settle the matter but to no avail. On July 25, 1974 Mr. Unger wrote Mr. Danzis and rejected a $200,000 offer by the company and enclosed a summons and complaint in a tort action. He also stated that a stockholder suit would follow shortly. The Complaint sought recovery against the company and Andrew Jr. by way of a tort claim for allegedly conspiring to drive Anthony out of the corporation, thereby depriving him of his future right to wages. On July 30, 1974, Mr. Unger mailed the complaint in the tort action to the Clerk of the New Jersey Superior Court for filing. Mr. Unger included a document with the complaint which stated that another lawsuit would be commenced against the corporation within a short time by Anthony as stockholder of the corporation pursuant to the Minority Stockholder Freeze-out Statute. *N.J.S.A.* 14A:12–7.

Plaintiff became concerned about the threatened stockholder suit because of the disruptive impact it would have on the company and its executives at a time when it was attempting to enter into a period of substantial expansion. Such a suit would necessarily involve an accounting and reproduction, examination and analysis of a large number of documents, and would un-

doubtedly incur a large legal expense notwithstanding the final result.

On July 31, 1974, Mr. Danzis phoned Mr. Unger relaying the company's agreement to pay Anthony severally the total sum of $300,000. Mr. Unger stated to Mr. Danzis that he wanted to make the balance of the payment over and above the payment for the stock non-taxable to Anthony and authorized Mr. Danzis to keep the summons and complaint in the tort action and not acknowledge service unless he decided not to settle. On August 1, 1974, Anthony filed a workmen's compensation claim petition with the New Jersey Department of Labor and Industry. The complaint in the tort action was returned unfiled by the Clerk of the Superior Court, at Mr. Unger's request.

On September 11, 1974, a final offer totalling $301,000, which included final disposition of the workmen's compensation matter, was submitted by the company and by Andrew, Jr. That offer was accepted on September 20, on the assumption that approximately $87,000, "which would represent the book value of his stock," be allocated to the stock sale and the remainder to "personal injuries," and that all medical expenses arising from the injury be paid by the company. Request was also made on Anthony's behalf for payment of weekly salary payments made to the company by the insurer since July 5, 1974, the date Anthony's employment was terminated.

In addition, Anthony's counsel sought an indemnification for Anthony against tax liability. The company responded, by counsel's letter of September 23, 1974, that they had no objection to "including in the settlement agreement a statement to the effect that the sum is paid to your client as reimbursement for personal injuries for tax purposes," but could not indemnify Mr. Unger's client in the event the Internal Revenue Service would successfully contend the proceeds were taxable to him. By letter of October 15, the company's counsel advised

that the agreement prohibited continued prosecution of the workmen's compensation claim, and its continuation jeopardized the settlement.

On October 10, 1974, following conclusion of the negotiations, the stockholders and directors of the company signed "minutes" of a "special joint meeting of the stockholders and board of directors." [5] These minutes reflected the understanding Joe had with the company's counsel as to the manner in which the purchase and settlement would be structured. The "minutes" recorded the stockholders' and directors agreement to pay Anthony and his wife $196,500 "in full settlement of all claims of any kind" against the corporation, plus $94,592 in redemption of his ten percent stock interest (such amount reflecting the value of his stock as determined by the 1973 financial statement of the corporation) and that the payment of $196,500 would be deductible by the company under Section 1.162–10 of the Treasury Regulations and non-taxable to Anthony under Section 104(a)(2) of the Internal Revenue Code. In response to a further demand made by Mr. Unger, Mr. Danzis replied, by letter of October 18, that the company had "no intention of paying Anthony Naporano for any medical expenses incurred after the date of closing whether or not they are related to the subject altercation."

On October 29, 1974 closing was held on the settlement, and an agreement dated October 24, 1974, was signed by the parties. The agreement provided *inter alia* that the company pay Anthony and his wife $196,500, "in full settlement of any and all claims against it resulting from the personal injuries"; that such payment was "not to be regarded as personal income," to Anthony; that such payment by the company was on account of compensation for injuries received by an employee not compensated for by insurance; that Andrew, Jr. pay Anthony and his wife $10,000 "in full settlement of any and all claims against

---

**5.** Although no meeting was actually held, Joe took the "minutes" to the other individuals and directed them to sign. The procedure was in keeping with the usual informal administrative practices of the family-run company.

him resulting from the aforesaid personal injuries which payment is not to be regarded as personal income"; that the company pay Anthony $94,592 in redemption of his stock; that Anthony dismiss with prejudice his workmen's compensation claim and "any other pending litigation with the Corporation"; and that the company pay all medical expenses of Anthony to the closing date, to the extent not paid by New Jersey Manufacturing Insurance Company.

By letter of December 11, 1974, Mr. Danzis advised Mr. Unger that New Jersey Manufacturers had made additional medical payments, and that the company was maintaining an escrow account with its attorneys which would cover any additional outstanding medical bills. On December 27, 1974, Mr. Danzis forwarded to Mr. Unger a check representing final payment of the medical bills. The order discontinuing the workmen's compensation claim was also filed. Full payment under the settlement was made to Anthony on December 27, 1974.

Plaintiff company, on its Federal Corporation Income Tax Return for 1974, deducted the $196,500, paid to Anthony, as "employee morale improvements (Sec. 162)," and also deducted the legal fees ($12,500) associated with the settlement. On October 5, 1976, the New Jersey Department of Labor and Industry issued a notice of lien for temporary disability benefits, in the amount of $1,782 paid to Anthony during the period August 10, 1973, through December 5, 1974. On an audit of the company's 1974 return, the Internal Revenue Service disallowed the deduction of $196,500, which the company contended was deductible as a payment on account of injuries to a former employee, under Section 1.162–10(a) of the Regulations. The deduction of legal fees of $12,500 was also disallowed. The Service assessed the corporation for the deficiency attributable to the disallowed deductions,[6] and, on the theory that the payments in question were constructive dividends to Andrew, Sr., and Andrew, Jr., made deficiency assessments for their taxable years 1974–1975.

By January 10, 1979 plaintiffs paid the assessed deficiencies and interest thereon for all years in question. The assessed deficiencies and payments are shown more particularly as follows:

| | Year | Deficiency | Interest | Total |
|---|---|---|---|---|
| Naporano Iron | 1974 | 100,319 | 25,751.06 | $126,070.06 |
| Andrew, Sr. & Wife | 1974 | 137,128 | 34,513.98 | $171,641.98 |
| Andrew, Jr. & Wife | 1974 | 118,649 | 29,862.98 | $148,511.98 |
| | Year | Deficiency | Interest | Total |
| Andrew, Sr. & Wife | 1975 | 4,671 | 844.20 | $ 5,515.20 |
| Andrew, Jr. & Wife | 1975 | 6,691 | 1,193.43 | $ 7,844.43 |
| | | | Total | $459,623.65 |

The earnings and profits of the company for the years in question were sufficient to support the Services' constructive dividend theory. Timely claims for refund of these deficiencies were filed with the Internal Revenue Service by the company and the individual taxpayers. The claims were denied, and this suit for refund of taxes ensued. Jurisdiction is proper pursuant to 28 USC 1491.

## DISCUSSION

Despite the voluminous and complex nature of the factual situation in this case, the legal issue before the court is a narrow one; what is the proper characterization, for tax purposes, of the $196,500 payment

**6.** The Internal Revenue Service treated the $196,500 payment as a capital expenditure for the repurchase of Anthony's stock. However, it is clear from the evidence presented at trial that the company repurchased Anthony's stock for $94,592 which was in addition the $196,500 payment. The $94,592 represents the book value of the stock as shown on the corporate records and was comparable to a subsequent purchase of company stock.

made by Naporano Iron and Metal Company to Anthony Naporano. Plaintiff claims that the payment was made by the corporation to compensate for injuries received by an employee not compensated for by insurance, and, therefore, was properly deductible by the company under Section 162 IRC and Section 1.162–10 of the regulations. Alternatively, plaintiff contends that the corporation's deduction of such payment was proper as settlement of litigation and claims, which, upon the advice of counsel, was in the best interest of the corporation. Defendant, on the other hand, contends that the payment constituted a non-deductible capital expenditure to the corporation (repurchase of stock) and also constituted a constructive dividend to its shareholders, plaintiffs Andrew Naporano, Sr., and Andrew Naporano, Jr. Defendant disallowed the payment as an "ordinary and necessary" business expense deductible under IRC section 162 and assessed a deficiency and imposed constructive dividends and subsequently denied plaintiffs' request for a refund after payment. The court is now asked to review the Service's determination.

■ Inherent in the Internal Revenue Service's assessment against a taxpayer is a presumption of correctness, and the burden "unquestionably rests on the taxpayer to disprove the [service's] findings." *Montgomery Coca-Cola Bottling Company, Inc. v. United States*, 222 Ct.Cl. 356, 365–366, 615 F.2d 1318, 1322 (1980). Plaintiff is therefore left with the task of presenting sufficient evidence to show that the $196,500 payment was properly deductible under section 162 of the Internal Revenue Code. In addition, plaintiff must show that the $196,500 payment was not a constructive dividend to plaintiff taxpayers and that defendant errored in assessing plaintiffs with additional taxes based on the constructive dividend theory. In effect, plaintiff must show that the settlement transaction was indeed what it purports to be and that it was not a sham transaction.

Section 162(a) Internal Revenue Code of 1954 (IRC) provides, in pertinent part:

*In General.* There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business ...

The applicable regulations limit the scope of the deduction as follows:

Only expenses which are 'directly connected with or pertaining to the taxpayer's trade or business' are deductible. Section 1.162–1(a), Treasury Regulations on Income Tax (Treas. Regs.)

Plaintiff corporation allegedly deducted the $196,500 payment, together with related costs and legal expenses under the authority of Section 1.162–10 of the Treasury Regulations. In pertinent part, Section 1.162–10 of the regulations states:

Amounts paid or accrued by a taxpayer on account of injuries received by employees and lump-sum amounts paid or accrued as compensation for injuries are proper deductions as ordinary and necessary expenses. Such deductions are limited to the amount not compensated for by insurance or otherwise ...

Defendant disallowed the deduction on the basis that the transaction was not governed by the foregoing regulatory section; rather, that the payment in question involved settlement of litigation and not compensation for injuries. It is well-settled that amounts paid in settlement of charges of civil fraud or improper conduct of a business, and the legal expenses of defendant against such charges, are allowed as business expense deductions pursuant to Section 162 of the IRC.[7] However, defendant refused to allow a deduction under the latter theory by labeling the transaction a sham. Plaintiffs contend that, contrary to the contentions of defendant, the transac-

---

7. *See, e.g., Helvering v. Hampton,* 79 F.2d 358 (9th Cir.1935); *Parker v. Commissioner,* 365 F.2d 792 (8th Cir.1966); *James E. Caldwell & Co. v. Commissioner,* 234 F.2d 660 (6th Cir. 1956); *Redwood Empire Saving & Loan Assoc. v. Commissioner,* 628 F.2d 516, 520 (9th Cir. 1980).

tion was not a sham; that the litigation was real and vigorously contested. Moreover, plaintiffs claim that under either theory. the corporation is entitled to a deduction with the asserted constructive dividends falling as a consequence thereof.

In November of 1980 plaintiffs moved for summary judgment on the issues of whether plaintiffs' corporation was entitled to deduct as an ordinary and necessary business expense a payment made to a former employee in asserted settlement of a tort claim and whether, if such deduction was improper, the payment constituted a constructive dividend to stockholders of plaintiffs' company. Defendant filed a cross-motion and brief in opposition to plaintiffs' motion for summary judgment. On December 1, 1981, the Court of Claims[8] in a per curiam opinion, denied the cross-motions for summary judgment citing the need for "further ventilation and determination of the facts and circumstances ... before proper decisions can be made."[9] The court identified, in particular, uncertainty as to the status under New Jersey law and practice of Anthony's claim, as well as the possibilities of serious, prolonged, burdensome, or successful litigation of that claim against the Naporano company.

At trial the evidence presented focused on the history and character of the transaction, the status under New Jersey law and practice of Anthony's claim and the possibility and potential impact of serious, prolonged, burdensome, or successful litigation of claims against plaintiffs' corporation. Based on a complete evaluation of all evidence presented at trial, the court finds that plaintiff successfully carried its bur-

den of proof and that the court is convinced that the transaction constituted compensation for injuries to Anthony not compensated for by insurance and, in addition, was a bona-fide settlement of a viable and potentially damaging claim, and that the settlement was in the best interest of plaintiffs' corporation. Based on these findings, the court is of the opinion that under either of the theories articulated by the plaintiffs, the deduction by plaintiffs' corporation is allowable.

■ Under Section 1.162–10 Treasury Regs. a payment on account of injuries received by employees and lump-sum amounts paid as compensation for injuries are by definition ordinary and necessary expenses and, as such, are deductible. The amount deductible, however, is limited to "the amount not compensated for by insurance or otherwise ..." The parties have stipulated to the fact that Anthony was injured in a dispute with Andrew, Jr., and that plaintiffs' corporation made a payment of $196,500 to Anthony. At trial it was shown that under New Jersey law Anthony was not eligible to recover under the Workmen's Compensation law and that he, in fact, received no "compensation" for his injuries other than that received from plaintiffs or plaintiffs' insurance carrier. Therefore, it is the opinion of the court that the complete payment was in fact compensation for injuries to an employee and is properly deductible pursuant to the guidelines set forth in Section 1.162–10(a).

The court is also of the opinion that the payment or a part thereof also qualifies as a deduction of an expenditure associated with litigation or a payment in settlement of a claim.[10]

---

**8.** The Federal Court Improvement Act of 1982, Pub.L. 97–164, § 133(a), 1982 U.S.Code Cong. & Ad.News (96 Stat.) 39, as it amended 28 U.S.C. § 1491, abolished our predecessor court, the United States Court of Claims and, among other things, created this court, the United States Claims Court.

**9.** Both motions were denied without prejudice and the case was remanded to the trial division (now the United States Claims Court) for trial.

**10.** In stockholder derivative suits, which are a close parallel to the present situation, it is a well settled rule that a payment made by a corporation in settlement of a stockholder's derivative suit against it constitutes an ordinary and necessary business expense. *Dynamics Corporation of America v. United States,* 196 Ct.Cl. 282, 300, 449 F.2d 402 (1971). See also: *C. Ludwig Baumann & Co. v. Marcelle,* 203 F.2d 459 (2d Cir. 1953); *Federation Bank and Trust Co. v. Commissioner* 27 T.C. 960 (1957), aff'd. 256 F.2d 764 (2d Cir.1958).

In accordance with Section 162, a business expense is deductible if it is ordinary and necessary. Before the court can determine whether it is an ordinary and necessary expense, it must first ascertain whether it is a legitimate business expense.[11] Defendant contends that in order to deduct an expenditure associated with litigation or a payment in settlement of a claim, the claim must *"arise* in connection with the taxpayer's profit seeking activities. It does not depend on the *consequences* that might result from a failure to defeat a claim." *United States v. Gilmore*, 372 U.S. 39, 48, 83 S.Ct. 623, 629, 9 L.Ed.2d 570 (1963). This "origin of the claim" focus, as it has become known, makes the taxpayer's motive or purpose in making a settlement irrelevant. *Anchor Coupling Company, Inc. v. United States*, 427 F.2d 429, 432 (7th Cir.1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 866, 28 L.Ed.2d 806 (1971).

Testimony at trial showed that the claim arose directly from the operation of plaintiffs' business and was not, as defendant would contend, an unrelated incident. The business of a corporation is conducted by its officers, directors, and employees. A necessary aspect of conducting business is the effective human interaction of company personnel. It is, thus, impossible to separate the human incidents that occur in the course of transacting business from the conduct of the business itself. In the present case the altercation arose during the conduct of company business and, thus, for purposes of this case it "arose in connection with the taxpayer's profit seeking activities." *Gilmore*, 372 U.S. at 48, 83 S.Ct. at 629.

However, in the alternative, if the court was not entirely convinced that the claims arose from the profit-seeking activities, which the court is, this doctrine, as developed in *Gilmore*, may be distinguished in the present case. The *Gilmore* decision dealt with the expense incurred by an individual taxpayer in defending against his wife's suit for divorce, the origin of the claim being the marital relationship. However, in the present case, Anthony was going to name the company as a party defendant, thereby directly involving the company in the litigation and exposing it to potential liability. Thus, the direct exposure to the risk of a monetary judgment is significant in distinguishing the present case from that of *Gilmore. Kopp's Co. v. United States*, 636 F.2d 59, 61 (4th Cir. 1980); *Dolese v. United States*, 605 F.2d 1146, 1151 (10th Cir.1979), *cert. denied*, (1980).

In the present case, as in the *Kopp's* case, there is a bona fide litigation. Testimony at trial substantiated plaintiffs' allegation that under New Jersey law and practice the claim made against the corporation alleging a plan and conspiracy to intimidate Anthony to terminate his employment relationship and lose future compensation and for damages from his injuries caused by the corporation's actions was sufficient as a pleading to survive a motion to dismiss and to put in issue a claim of commission of an intentional tort by the corporation in the state of New Jersey. *See Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1980). Furthermore, testimony at trial substantiates the serious nature of Anthony's personal injuries resulting from the commission of a tort by the agent of the corporation which alone would provide a reasonable basis for a substantial settlement by the corporation.

In addition, testimony substantiated that Anthony was prepared to file a stockholder suit which could have been disruptive to the corporation. Anthony could have included in the stockholder suit a claim under the Minority Shareholder Freeze-out statute in New Jersey, NJSA 14A:12–7 which specifically permits a stockholder of a closely held corporation to show action adverse to his interest as an employee. A successful action could have proved devastating to the corporation especially if puni-

---

11. *See Kopp's Company, Inc. v. United States*, 636 F.2d 59, 61 n. 1 (4th Cir.1980).

tive damages and counsels' fees were awarded to Anthony.

The last consideration is whether this legitimate business expense is necessary and ordinary. In *Loewy Drug Company of Baltimore City v. United States*, 232 F.Supp. 143, 148 (1964), the court held that in order for an expense to be necessary it must be shown both that: (1) there are business ends to be served; (2) there was an intention to serve those business ends, by means of the questioned expenditures. The Supreme Court, has also advanced a broad definition for the interpretation of the word necessary. *Commissioner v. Tellier*, 383 U.S. 687, 689, 86 S.Ct. 1118, 1120, 16 L.Ed.2d 185 (1966), stated that:

> Our decisions have consistently construed the term necessary as imposing only the minimal requirement that the expense be 'appropriate and helpful' for the development of the [taxpayer's] business.' *Welch v. Helvering*, 290 U.S. 111, 113 [54 S.Ct. 8, 9, 78 L.Ed. 212] (1933).

The court finds that this settlement payment was intended to serve business ends and that the expense was appropriate and helpful for the development of the taxpayer's business. The fact that the lawsuit was rare does not make its cost the less as "ordinary and necessary" expenses. *Helvering v. Hampton*, 79 F.2d 358, 359 (9th Cir.1935). Furthermore, the court holds that plaintiff corporation reasonably relied on the advice of counsel in settling the dispute and it is unnecessary for the court to speculate what would have happened if the claims settled had proceeded to trial. *Oldtown Corp. v. Commissioner*, 37 T.C. 845 (1962). Thus, we hold that cost of settlement is deductible as an "ordinary and necessary" expenses in conducting a trade or business.

For further support that such a settlement is an allowable deduction, we refer to a case strikingly similar to the present one, *Atwater v. United States*, 10 T.C. 218, 234

(1948). In *Atwater*, the court ruled that the excess of the payment over the fair market value of the shares of stock constitutes an allowable deduction as an ordinary and necessary business expense. The factual differences between these two cases (in *Atwater* there was a judgment rather than a settlement and fair market value rather than book value was used for the redeemed stock), are not enough to detract from the basic premise that the excess was an allowable deduction as an ordinary and necessary business expense.[12]

■ We now consider the issue whether the attorney's fees are an allowable deduction in this type of proceeding. It is well settled that attorney's fees are an allowable deduction and it is basically the same criterion used for allowable settlement deductions. In an oft-cited case, *Kornhauser v. United States*, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505 (1928), attorney's fees paid in defense of a suit concerned with business were deductible from gross income as an "ordinary and necessary" expense in carrying on a business. The basis of this doctrine is that where a suit is directly connected to, or prominently results from, the business the expense incurred is a business expense. See also *Parker v. Commissioner of Internal Revenue*, 365 F.2d 792, 801 (8th Cir.1966).

*Kornhauser* was cited with approval by this court in *Allied Chemical Corporation v. United States*, 158 Ct.Cl. 267, 278, 305 F.2d 433 (1962). Again it was stated that the expense need not relate to the production of income for business, but merely be connected with the conduct of the business. In the present case we find that the costs of litigation were incurred by plaintiff corporation in the course of carrying on its business.

■ The last issue to be considered is whether the payment by the company to Anthony was properly attributable to plain-

---

**12.** In the present case book value was used. In a closely held family corporation stock values are difficult to determine. Book value was used at a later sale of stock to a different party and thus the court accepts this figure in determining how much is excess and is to be allowable as a deduction.

tiffs as constructive dividends [13] in light of the holding that the payment is deductible by plaintiff corporation. The test for constructive assertion of income is that the party making the payment was doing it solely for the benefit of the person charged constructively with income. *Old Colony Trust Co. v. Commissioner,* 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929). In situations involving claimed constructive dividends, the form of the transaction is of great significance. Here the form of the transaction conformed to its substance. A purchase of stock was made at its book value. A settlement of litigation, existing and potential, against the corporation was made and settlement thereof was a reasonable response to the threat.

Plaintiff presented extensive evidence, which was for the most part unrebutted by defendant, showing the valid business nature of the transaction. That, along with the fact plaintiff, Andrew, Jr., settled separately with Anthony on the personal claim against him, effectively discredits the constructive dividend theory asserted by defendant. Furthermore, defendant failed to establish that a constructive dividend should be charged jointly to the plaintiffs' for $196,500 let alone that each plaintiff was in receipt of a constructive dividend of $196,500. In the opinion of this court plaintiff has more than adequately carried its burden of proof and is therefore entitled to relief.

## CONCLUSION

The court, therefore, holds that the payment and the legal expenses incurred by the company were ordinary and necessary business expenses of the corporate taxpayer and that the payment made was not constructively received by, nor did it constitute, by the corporation, a constructive dividend to the individual plaintiffs. The plaintiffs are thus entitled to a refund of costs and all taxes paid with interest.

IT IS, THEREFORE, ORDERED that judgment be entered for plaintiffs for the amount of $459,623.65, together with interest, as allowed by law, and costs.

IT IS SO ORDERED.

---

**13.** For tax purposes a dividend is defined as a distribution of property by a corporation to its shareholders from its earnings and profits. The effect of a particular corporate expenditure on the corporation's shareholders is governed by sections 301 and 316, Internal Revenue Code of 1954. However, a shareholder may be in receipt of taxable dividends or constructive dividends where there has not been a formally declared distribution of corporate earnings and profits directly to them but they have received an indirect benefit from a distribution of corporate property to a third party. The distribution must be out of available corporate earnings and profits. See *Clark v. Commissioner,* 266 F.2d 698 (9th Cir.1959); *Iron Range Plastics, Inc. v. United States,* 49 A.F.T.R.2d 612, 614 (D.Minn. 1981).