*Decision will be entered under Rule 50.*

---

JAMES L. LOHRKE AND JUNE M. LOHRKE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5279–65. Filed August 10, 1967.

*Gordon W. Gerber*, for the petitioners.
*Edward L. Newberger* and *Dennis C. DeBerry*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency in the petitioners' income tax in the amount of $24,559.91 for the taxable

year 1962. The only issue for decision is whether a payment made by the petitioner to a customer of a corporation in which the petitioner had a substantial interest was an ordinary and necessary expense of a trade or business operated by the petitioner as a proprietorship.

Some of the facts were stipulated, and those facts are so found.

The petitioners, James L. Lohrke and June M. Lohrke, are husband and wife who resided in West Chester, Pa., at the time the petition was filed in this case. They filed their joint Federal income tax return for the calendar year 1962 with the district director of internal revenue, Philadelphia, Pa. James L. Lohrke will be referred to as the petitioner.

The petitioner's father, James L. Lohrke, Sr., was an inventor, and during his lifetime, he developed several new ideas for processes in the textile-manufacturing field. Lohrke, Sr., was the owner of several patents, including one on the "Perlok" process for converting synthetic fibers in continuous filament form (tow) into fibers of short length in strand form (top) comparable to natural fibers such as wool.

A few large chemical companies produce tow, which is sold to textile mills, where the tow is converted into top. The top is processed into yarn, and the yarn is then made into fabrics such as rayon, nylon, orlon, and dacron.

In the 1940's Lohrke, Sr., became associated with the Garth Manufacturing Co., a sole proprietorship owned by H. L. Garth. This relationship continued until the death of Lohrke, Sr., in 1949. Lohrke, Sr., used the Garth plant to develop and demonstrate the Perlok process. H. L. Garth operated the plant, and Lohrke, Sr., provided the necessary capital and handled sales. Profits were equally divided between the two.

Lohrke, Sr., died on July 27, 1949. Under the terms of his will, a trust was established, and his share of the royalty income from the licensing of the Perlok process was to be paid 50 percent to his surviving wife, later known as Mary M. Simpler, 25 percent to his daughter Lois L. Read, now known as Lois L. Ellison, and 25 percent to the petitioner, as income beneficiaries. The surviving wife and the petitioner were named executors and trustees under the will.

From 1949 until 1964, when the Perlok process patent expired, the petitioner licensed companies in the United States and elsewhere to use the Perlok process. He conducted this activity as an executor and trustee under the will of Lohrke, Sr., between 1949 and 1959. In 1959 and 1960, he acted as the only general partner in a limited partnership known as the J. L. Lohrke Estate, to which the Perlok process patent had been assigned. At the dissolution of the limited partnership in

1960, the petitioner agreed to pay 55 percent of the gross royalty income to the former limited partners in return for their assignment to him of their interests in the patent, and he then conducted this activity in his individual capacity from 1960 to 1964. After paying such percentage to the former limited partners and the expenses of promoting the patent, the petitioner was entitled to the remaining royalty income.

The total royalty income produced annually by the licensing of the Perlok process during the period 1960 to 1964 was $233,751.04 for 1960, $469,543.62 for 1961, $463,461.80 for 1962, $448,831.11 for 1963, and $279,437.23 for 1964. Computed without regard to the payment which is the subject of this controversy, the petitioner's share of such income during these years was $74,170.52 for 1960, $156,323.90 for 1961, $172,648.28 for 1962, $145,778.36 for 1963, and $69,850.69 for 1964.

The petitioner has also been interested in a business using the Perlok process to manufacture top for sale. Between 1949 and 1955, the petitioner continued the same arrangements with H. L. Garth that his father had prior to 1949. This informal partnership was known as the J. L. Lohrke Co. and was formalized by the execution of a written partnership agreement on January 1, 1955. In March 1961, Lohrke Textiles, Inc. (Textiles), purchased the assets of the J. L. Lohrke Co. and took over all manufacturing and selling functions, which it has carried on to the date of the trial of this case. After March 1961, all of the outstanding shares of Textiles were owned by the J. L. Lohrke Co. The net profits and losses of the J. L. Lohrke Co. were distributable 61.3 percent to the petitioner, 25.8 percent to Mary M. Simpler, and 12.9 percent to Lois L. Read. A corporation was considered by the petitioner to be a better means of handling the manufacturing business since, among other advantages, a corporation has unlimited life.

Textiles showed a net loss in the amount of $32,707.82 for its fiscal year ending in 1961, $80,045.57 for its fiscal year ending in 1962, $52,260.15 for its fiscal year ending in 1963, $5,903.23 for its fiscal year ending in 1964, and $15,174.05 for its fiscal year ending in 1965. The petitioner received income from Textiles in the amount of $6,202.42 in 1960 and no income in any of the years 1961 through 1965.

The petitioner has also invented new processes for use in the synthetic fiber industry. He now owns two new patents, one of which is a further invention relating to the basic Perlok process patented by Lohrke, Sr.

In 1961, Textiles entered into a business relationship with Francis Willey (Synthetics) Ltd. (Willey), for the purpose of promoting the sale of top in England. At that time, the sale of top by Textiles in both foreign and domestic markets had decreased from sales in prior years

because many foreign and domestic mills had become licensees of the Perlok process, transforming them from customers into competitors of Textiles.

As part of the business relationship between Willey and Textiles, Willey ordered top from DuPont United Kingdom, specifying Textiles as the processor. DuPont United Kingdom transmitted the orders to DuPont in Wilmington, Del., which then advised Textiles of such orders. After manufacturing an order of top, Textiles billed DuPont in Wilmington, which paid Textiles the amount due it. Ultimately, DuPont United Kingdom billed Willey for the order.

A shipment of defective top was made to Willey in the early summer of 1961. The defect was the result of a failure by Textiles to make normal quality-control checks, and the responsibility for the defective top rested upon Textiles. In a telephone conversation with A. W. J. Massam, a director of Willey, in the middle of July 1961, the petitioner was advised by Massam that Willey preferred to ship the top back to Textiles, but that Willey would accept both the top already delivered and the top still in transit and would pay DuPont if the petitioner would agree to be personally responsible for any loss Willey might suffer. Massam, at that time, was aware of the poor financial condition of Textiles inasmuch as in earlier discussions in England, the petitioner had told Massam and others at Willey that Textiles needed to make sales in England because the success of the petitioner in licensing the Perlok process had made it difficult for Textiles to do a profitable business elsewhere. In that telephone conversation, the petitioner agreed to assume personal liability for any loss and later confirmed the agreement in a letter dated July 20, 1961.

The petitioner believed that if he did not agree to be personally liable for whatever losses Willey might sustain by accepting the top, his personal business future would be harmed. This belief was based in part on the realization that if Willey did not pay DuPont for the top, DuPont would have sought repayment from Textiles, which did not have sufficient cash. The petitioner feared that Textiles's involvement with DuPont over a defective shipment of top might become known to the entire synthetic fiber industry. The petitioner further did not want to lose the benefits that he, as a licensor and inventor, derived from having access to the manufacturing facilities of Textiles.

The petitioner did not attempt to distinguish his activities as licensor and inventor from his activities as president of Textiles to any members of the synthetic fibers industry. He described and used Textiles as a pilot plant and earlier advertised the J. L. Lohrke Co. as owner of the Perlok process patent. This was done partly to make clear to prospective licensees that Textile's evaluation of the Perlok process was not being given as an independent company. The peti-

tioner regularly offered samples of top processed by Textiles to prospective licensees. A total of 80 companies became licensees of the Perlok process, and 58 of this number had purchased top from Textiles or the J. L. Lohrke Co. before becoming licensees. Forty-six of the 80 licensees visited the Textiles plant to see the machinery needed for using the Perlok process in operation before entering into licensing agreements. The petitioner or his specially trained associate supervised and assisted the installation or repair of machinery for 71 of the licensees.

The petitioner believed that his interest in Textiles gave him a sufficiently intimate knowledge of trade activities for him to know whether companies were using the Perlok process without a license or whether licensees were paying inadequate royalties for the quantity of top they were producing.

Between July 1961 and July 1962, Willey attempted to sell the defective top in order to minimize the loss, but the attempt failed. Before the exact amount of the liability to Willey had been determined, Textiles paid Willey $10,000 in January and $10,000 in February of 1962. During this 2-month period, the petitioner made loans to Textiles in excess of $20,000.

By July 1962, Willey had determined the amount of the loss due to the defective top. Willey, on July 5, 1962, sent its invoice for the unpaid balance of the loss and a letter stating that unless the account were settled by by July 31, 1962, Willey would have to seek recovery of the amount owed through other channels. Both the invoice and the letter were addressed to "Lohrke Textiles Inc. and/or James L. Lohrke."

Textiles did not have sufficient cash to pay Willey, so the petitioner sent to Willey a check dated July 23, 1962, for $30,000 drawn on his personal royalty account. This payment satisfied the obligation to Willey.

The petitioner treated the $30,000 payment as an expense of his business as licensor of the Perlok process and in his income tax return charged such expense against royalties received. He treated the payment as a deductible expense of his personal licensing business.

The petitioner sent his $30,000 check directly to Willey. No entries relating to such payment were ever made in Textile's books, and the other stockholders of Textiles were never consulted about the payment. The petitioner has never sought reimbursement from Textiles for the payment, and he did not intend that the payment to Willey should be a loan to Textiles.

The petitioner had made many loans to Textiles and its predecessor, the J. L. Lohrke Co., but with the exception of the two $10,000 loans in January and February of 1962, the loans have been used by Textiles

to offset normal operating deficits. The petitioner had never loaned Textiles more than $12,000 at any one time, and all of the petitioner's loans were carried on Textile's books as loans from the petitioner. The other stockholders of Textiles were advised of these loans.

## OPINION

This case presents us with the question of whether one person can deduct the expenses of another person. The obligation to pay for the defective shipment of top was primarily that of Textiles, and the respondent argues that for that reason, the payment was not an ordinary and necessary expense of the trade or business of the petitioner and is not deductible by him. On the other hand, the petitioner contends that he made such payment in order to protect and further the trade or business of licensing the use of the Perlok patent and that accordingly, the payment is an ordinary and necessary expense of that business and is deductible by him. Both parties have treated the petitioner's patent licensing activity as constituting a trade or business.

A business expense, to be deductible under section 162 of the Internal Revenue Code of 1954,[1] must be both ordinary and necessary. Generally, payment by one taxpayer of the obligation of another taxpayer is not ordinary and necessary. In *Welch* v. *Helvering*, 290 U.S. 111, 114 (1933), the Supreme Court stated that "Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily." In that case, the taxpayer was secretary of a corporation which had gone through bankruptcy. In order to reestablish his relations with customers whom he had known when acting for the bankrupt corporation and to solidify his credit and standing, the taxpayer undertook to pay the debts of the corporation. The Court denied a deduction for these payments, saying that they were in the nature of capital expenditures to develop his new business.

The general rule was reiterated by the Supreme Court in *Deputy* v. *du Pont*, 308 U.S. 488 (1940). In that case, a substantial shareholder of du Pont borrowed from other shareholders du Pont stock which he sold to some key employees of du Pont to enable them to acquire stock in the corporation. He sought a deduction for the expenses of acquiring the stock, but the Court held that such expenses were not deductible. Although they may have enhanced the value of his interest as a shareholder in du Pont, such interest did not constitute a trade or business; the expenses were the ordinary and necessary expenses of the trade or business of du Pont, not one of its shareholders.

As in the case of most general rules, an exception to this one has been developed. In a number of cases, the courts have allowed deduc-

---

[1] All statutory references are to the Internal Revenue Code of 1954.

tions when the expenditures were made by a taxpayer to protect or promote his own business, even though the transaction giving rise to the expenditures originated with another person and would have been deductible by that person if payment had been made by him. See, e.g., *C. Doris H. Pepper*, 36 T.C. 886 (1961), acq. 1962-1 C.B. 4; *Cubbedge Snow*, 31 T.C. 585 (1958), acq. 1959-1 C.B. 5; *Charles J. Dinardo*, 22 T.C. 430 (1954), acq. 1954-2 C.B. 4; *Ray Crowder*, 19 T.C. 329 (1952), acq. 1953-1 C.B. 3; *L. Heller & Son, Inc.*, 12 T.C. 1109 (1949), acq. 1949-2 C.B. 2; *Catholic News Publishing Co.*, 10 T.C. 73 (1948), acq. 1948-1 C.B. 1; *Scruggs-Vandervoort-Barney, Inc.*, 7 T.C. 779 (1946), acq. 1946-2 C.B. 5; *Robert Gaylord, Inc.*, 41 B.T.A. 1119 (1940), acq. 1940-2 C.B. 3; *Hennepin Holding Co.*, 23 B.T.A. 119 (1931), acq. and nonacq. X-2 C.B. 31, 89.

In *Charles J. Dinardo*, *supra*, the taxpayers formed a partnership for the practice of medicine, specializing in accident and industrial injury practice. The taxpayers then organized a nonprofit corporation to operate a private hospital. Admissions to the hospital were limited to patients of the taxpayers, and patients were referred to the taxpayers because they could provide hospital care. The partnership received fees from patients referred to the hospital for medical services rendered by the taxpayers as members of the partnership. The partnership's offices were located in the hospital building. Although the taxpayers expected that current receipts of the hospital would cover current expenses, expenses exceeded receipts. In order to keep the hospital in operation and to avoid loss of medical fees, the partnership agreed to pay the hospital's operating deficits and did so. The Court allowed the deductions, stating that the partnership did not pay the hospital's operating deficits to enable it to make profits from the operation of the hospital, but the payments were made to keep the hospital in operation so that the partnership could continue to earn medical fees from patients who were hospitalized there. The payments were made to protect or preserve partnership income from loss or diminution.

In *Cubbedge Snow*, *supra*, the taxpayers were partners in a law firm that had derived steady and substantial fees from making abstracts and rendering opinions as to titles of real estate for lenders of money with realty as security. The partnership had accumulated abstracts of title to almost every subdivision in the area, enabling them to check titles and render opinions very profitably. However, fees from such work declined for several years prior to 1953 because some large lenders had left the community. To provide an additional source of abstract fees, the partnership organized a Federal savings and loan association and agreed to make good any operating deficits of the association for the initial 3 years. The partnership had a general understanding with the directors of the association that the firm would be

its attorneys. As of the end of 1954, the association had a deficit of approximately $3,200, and the partnership, pursuant to its agreement, paid such amount to the association. The Court allowed a deduction, stating that the expenditures were to promote an additional source of abstract practice. "The crucial and controlling factor lies in determining whether the acts done and expenditures made were motivated by a purpose to protect or to promote the taxpayer's business or were made as an investment in a new enterprise." (31 T.C. at 591.)

In *C. Doris H. Pepper, supra*, the taxpayers were engaged in a partnership for the general practice of law. In 1952, one Spiegel retained the taxpayers to assist him in securing financing for his plastic housewares jobbing business. The taxpayers secured lenders for Spiegel's business and, in addition, performed legal services for Spiegel, for which they received $13,000 in fees. In 1953, Spiegel admitted to the taxpayers that in fact he had no legitimate business and that invoices given as security for the loans that the taxpayers had helped secure were fictitious. Spiegel subsequently pleaded guilty to an indictment of first degree larceny. At the time the fraud was discovered, Spiegel and his company owed $65,000 to creditors that the taxpayers had obtained. The taxpayers paid this $65,000 and sought a deduction for the payment. The Court allowed the deduction and stated that the expenditures were essential to the very continuance of the taxpayers' practice and for the protection of their means of livelihood and that expenditures by a taxpayer to protect an established business are fully deductible as ordinary business expenses.

In *Lutz* v. *Commissioner*, 282 F. 2d 614 (C.A. 5, 1960), reversing a Memorandum Opinion of this Court, a Court of Appeals allowed an individual a deduction for expenses of a corporation which he paid. In that case, the taxpayer since 1931 had been engaged in Texas in buying and selling perishable agricultural produce as a broker and since 1942 had been growing some of his own produce. The taxpayer had a strong credit position, which was necessary to operate his business. The crated produce was labeled as the taxpayer's brands. The taxpayer, in the conduct of his farming operations, made initial outlays of funds long before he realized any return on his crops. He was paid when the crops were finally delivered and accepted. The taxpayer needed and had a license as a produce buyer and shipper from the U.S. Department of Agriculture. In 1941 or 1942, the taxpayer began similar operations in Idaho and Oregon. Separate sets of books were kept for each operation, but produce was packed and shipped under the taxpayer's name and brands, and many drafts were drawn on buyers by the taxpayer personally. During 1947, the Idaho and Oregon operations were incorporated for the benefit of their respective employees. Both before and after the incorporations, the taxpayer and the corporations used the

same trademarks. The taxpayer made personal advances to the corporations of about $108,000 in 1948 and $24,000 in 1949. He paid to creditors of the corporations about $70,000 in 1948 and $86,000 in 1949. These payments to the creditors were in issue. The court allowed deductions, saying that the payments were made to protect an existing goodwill of his individual business and to prevent loss of earnings that might result from destroying such goodwill. In addition, the court stated that the taxpayer had to pay the obligations of the corporations in order to retain his license from the Department of Agriculture.

On the other hand, the respondent calls our attention to several cases in which the courts have denied an individual a deduction when he made payments on behalf of another person. *Dodd* v. *Commissioner*, 298 F. 2d 570 (C.A. 4, 1962), affirming a Memorandum Opinion of this Court; *Jean U. Koree*, 40 T.C. 961 (1963) ; *S. M. Howard*, 39 T.C. 833 (1963) ; *Charles Oran Mensik*, 37 T.C. 703 (1962), aff'd. 328 F. 2d 147 (C.A. 7, 1964), certiorari denied 379 U.S. 827 (1964).

In *Charles Oran Mensik, supra*, the taxpayer owned over 98 percent of the stock of a savings and loan institution. He entered into a contract with the corporation providing that he would pay for the advertising of the corporation in return for the corporation referring its insurance business to him. He claimed a deduction for the costs of the advertising which he paid in accordance with this agreement. However, the Court disallowed a deduction, holding that in view of his control of the corporation he did not have to pay for its advertising in order to secure the insurance business.

In *S. M. Howard, supra*, the taxpayer was one of a group of osteopaths who organized an osteopathic hospital. Their patients were not admitted in the other hospitals in the area so that it was necessary for them to organize this hospital to take care of their patients. The taxpayer sought a deduction for his contribution toward the organization of the hospital, but the Court denied the deduction. The Court thought that the expenditure was more in the nature of a capital contribution since it would assist him in the practice of his osteopathic profession over a number of years.

In *Jean U. Koree, supra*, the taxpayer, who was a chemist, paid some of the expenses of a Cuban corporation which he had organized. He claimed a deduction for those expenses on the basis that he expected to receive an employment contract from the corporation if it succeeded. The deduction was not allowed, for the Court thought that the connection with his individual business was too speculative.

In *Dodd* v. *Commissioner, supra*, the taxpayer operated the Carolina Oil Equipment Co. as a sole proprietorship. This company was engaged in the sale of gasoline pumps, lubricating equipment, bulk plants, and the like to service stations and garages. The taxpayer's son and another

employee suggested that motor oil, tires, and batteries be added to the line. A corporation, Carolina Oil & Battery Corp., with a starting capital of $2,500, was formed in 1953 to handle this line. The taxpayer owned 20 percent of the stock, and all of the stockholders except one were employees of the taxpayer. The two businesses had the same address, the same employees, and many common customers. Separate books were maintained for each business. It was generally known in trade circles and among customers that the taxpayer was connected with both businesses. From its formation, no new capital was added, but the taxpayer made many advances to the corporation and directly paid some of its obligations. In 1957, the taxpayer took over all of the stock of the corporation and continued its operation. The taxpayer claimed a deduction for the advances, both direct and indirect, that he made to the corporation in 1955, 1956, and 1957. The court found that the taxpayer's purpose in making advances to the corporation was to pay the current expenses of the corporation in order to keep it in existence; any benefits to the taxpayer's own credit rating and goodwill were incidental. Accordingly, the deductions were disallowed.

A review of these cases leads us to conclude that in some situations an individual may deduct the expenses of another person. Although the respondent contends that the later cases of *Mensik*, *Howard*, *Koree*, and *Dodd* in which the deduction was not allowed have overruled the earlier cases, we do not agree; we think that the later cases are distinguishable. The tests as established by all of these cases are that we must first ascertain the purpose or motive which cause the taxpayer to pay the obligations of the other person. Once we have identified that motive, we must then judge whether it is an ordinary and necessary expense of the individual's trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? If so, the expense is deductible by the individual paying it.

Now let us apply these rules to the case before us. We must determine whether the petitioner's ultimate purpose in paying Textiles' obligation was to keep Textiles in existence, thereby perhaps realizing a return on his payment through corporate profits, or whether his purpose was to protect or promote his own business, realizing a return on his payment through continued profits in that business.

We must first make clear that, in our view of the case, the petitioner is not attempting to disregard the corporate entity of Textiles. The petitioner and Textiles are separate taxable entities, and ordinarily the expenses of one such entity are not the expenses of the other. However, our question here is whether there may be, and are present here, special circumstances whereby the obligation to Willey was the expense of whichever entity paid the obligation. For this reason,

*Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943), on which the respondent relies, is inapposite.

The petitioner was in 1961 and 1962 receiving very large amounts of royalty income from the licensing of the Perlok process. He personally undertook to protect Willey against any loss from its receipt of defective top from Textiles. According to his testimony, he made this promise in 1961 and the payment in 1962 in order to protect his individual licensing business and to prevent a diminution of his royalty income. In the petitioner's opinion, his failure to assume this obligation would have adversely affected his licensing business because of the harm that would have resulted to his own reputation in trade circles.

The respondent points to a number of facts in this case that support the view that the petitioner, in paying the obligation to Willey, was making a capital contribution to Textiles. The petitioner voluntarily created Textiles as a corporation. Textiles took over the business of the J. L. Lohrke partnership in 1961. Textiles operated at a loss in each of its fiscal years ending 1961 through 1965, and the petitioner made many loans to Textiles and the J. L. Lohrke Co. These facts tend to show that Textiles was in need of additional capital, and the payment of a corporation's expenses is one way to provide capital. In addition, the petitioner was a 60-percent stockholder of Textiles. While any contribution by the petitioner to Textiles' capital would inure partly to the benefit of other stockholders, the petitioner would be the primary beneficiary.

The petitioner realistically could have anticipated little or no return from a capital contribution to Textiles, at least in the near future. Textiles had no profits, and the petitioner's efforts to license the Perlok process decreased the likelihood of any future profits. In this respect, the present case is distinguishable from the *Dodd* case.

We are inclined to believe that the petitioner's primary motive was the protection of his licensing business. That business was providing him with a substantial income, and therefore, we can believe him when he says that he acted to protect that business. On the contrary, Textiles was unprofitable, and the prospects were that it would remain so. Thus, we think that the most likely explanation is that he acted to protect his profitable individual business.

We find that the petitioner's purpose in making the $30,000 payment to Willey was to protect his own personal licensing business and that the payment was proximately related to that business. Accordingly, the petitioner is entitled to deduct the $30,000 payment as an ordinary and necessary expense of carrying on his business of licensing the Perlok process.

*Decision will be entered for the petitioners.*