NARAYANAN, J.T.C.
This is the court’s opinion with respect to the above-captioned complaint which challenged the New Jersey Gross Income Tax (“GIT”) assessments of defendant, Director, Division of Taxation (“Director”) for tax years 2000 through 2002, imposed against plaintiffs Debbie and Daniel Schulmann.[1] For the reasons set forth below, the assessments are affirmed.

FACTS

The facts herein are based upon the undisputed documents provided by the parties in connection with their pleadings, as well *575 as the trial testimony of Daniel Schulmann. Testimony was also adduced from Michael Sachs, the Chief Financial Office of UAK Management Co., Inc. (“UAK”) and of TSK Franchise Systems, Inc. (“TSK”). The court found both witnesses to be forthcoming, sincere and credible.
For the tax years at issue, Debbie and Daniel Schulmann were New Jersey residents, residing at 9 Corn Mill Court, Upper Saddle River.[2] Schulmann is a trained martial arts instructor. From childhood onwards, he developed an interest in martial arts and underwent rigorous training in this field. He participated and represented the country in several championship contests. He eventually developed his own style and unique method, which he named and proprietarily registered as the “Tiger Schulmann Karate Method.” [3]
Thereafter, Schulmann opened several karate schools to impart training in this method, which included both mental and physical aspects. ■ Each karate school was incorporated as an S corporation, doing business as a Tiger Schulmann’s Karate School (hereinafter “corporate school” or “karate school” or “school”). In addition to providing martial arts instruction and training, the schools also imparted education on healthy diets, and sold related merchandise.
Schulmann also incorporated UAK as an S corporation with himself as its President and 100% stockholder. Its business addresses were 40 Eisenhower Drive, Paramus and 221 West Grand Avenue, Montvale. UAK provided a variety of management services for each of the corporate schools. Mr. Sachs testified that these services included managing and undertaking each school’s payroll, marketing, advertising, accounting and legal obligations/issues. Each corporate school had a separate bank *576 account which was separate from and independent of UAK’s bank account. UAK initiated and wrote checks for the operating expense of each school, such as for utilities, rent and payroll, from such account. It received a management fee from each corporate school for its services.
Schulmann testified that he desired to provide his students with both business and training/educational opportunities. To accomplish this dual purpose, Schulmann encouraged his trained students to become instructors at a new school, which would be incorporated as an S corporation having Schulmann and the trained student as joint owners therein. Schulmann held the controlling ownership (51%). The trained student would also be an instructor in this corporate school, responsible for training in and teaching the Tiger Schulmann Karate Method to the pupils of the corporate school. For such purposes, the trained student was treated as an employee of the corporate school, entitled to salary/bonus income, in addition to any net profits as a part-owner of the corporate school. Two sample agreements provided to the court (one from 1995, the other from 2001, titled “Employment Agreement” and signed by Schulmann as President) between a corporate school and a trained student evidenced such dual owner/employee undertaking.
As an additional incentive, the instructor was entitled to certain commissions if a student he or she trained, in turn, became an instructor in a separately incorporated Tiger Schulmann Karate School (under an identical owner/employee agreement as explained in the preceding paragraph). If a student of the latter instructor, in turn, became an instructor in another Tiger Schulmann Karate School, the first instructor was entitled to a further commission. Schulmann testified that in this manner, he provided his students-turned-instructors an incentive to become partners with him by sharing a portion of the profits of the new location, and at the same time, an incentive to spread Sehulmann’s unique and proprietary martial arts method by receiving commissions from newly opened karate centers.
*577 An instructor was entitled to a commission of 20% of the net management income of UAK from the two corporate schools. The 1995 sample Employment Agreement thus provided:
d) Commissions. During the term of his employment hereunder, Employee shall be entitled to a commission of the monthly net income of UAK ... derived solely from the Employee’s First Generation Centers and Second Generation Centers, subject to the terms and conditions set forth ... hereto____For purposes hereof, a “First Generation Center” means a Tiger Schulmann’s Karate Center operated by a black belt graduate from the Company’s Tiger Schulmann’s Karate Center who was trained without interruption by Employee from the rank of a white belt to a black belt (the “First Generation Sensei”) and a “Second Generation Center” means a Tiger Schulmann’s Karate Center operated by a black belt graduate from the First Generation Center, trained without interruption by Employee from the rank of a white belt to a black belt by the First Generation Sensei.
In a separate schedule, the method of computing the commissions was specified thus:
Employee shall be entitled to a monthly commission of twenty percent (20%) of the Net Management Fee received by UAK .. from a First Generation Center .. and a Second Generation Center.... For purposes hereof, the “Net Management Fee” means an amount equal to (i) the monthly management fee received by UAK ... from the First Generation Center and Second Generation Center, which fee is payable from such center’s Net Income (as defined in the [Employment] Agreement, less (ii) the monthly expenses and costs incurred by UAK ... which are attributable to its services and operations performed on behalf of or for the benefit of such centers. Payment in respect to each month during the term of this Agreement shall be made as soon as practicable after the determination by UAK .. of amounts owing hereunder.
The 2001 Employment Agreement amended the language to include an entitlement to commissions payable from “partial generation centers.” Thus:
d) Commissions, i) During the term of his employment hereunder, Employee shall be entitled to a commission of the monthly net income of UAK ... derived solely from the Employee’s “First Full Generation Centers,” “Second Full Generation Centers,” “First Partial Generation Centers,” and “Second Partial Generation Centers” subject to the terms and conditions set forth ... hereto____
ii) For purposes hereof, a “First Full Generation Center” means a Tiger Schulmann’s Karate Center owned and operated by a student of the Company’s Tiger Schulmann’s Karate Center, who, if a Sensei, was trained without interruption by Employee from the rank of a white belt to a black belt (if the owner is a non-Sensei the foregoing training requirements shall not apply) and who owns 49% of his Center, provided Employee owns 49% of his Center; and a “Second Generation Center” means a Tiger Schulmann’s Karate Center owned and operated by a student of a “First Full Generation Center” or a “First Partial Generation Center” (defined below), who, if a Sensei, was trained without interruption by Employee from the rank of a white belt to a black belt by the First Full Generation *578 Center” or the “First Partial Generation Center” (if the owner is a non-Sensei, the foregoi^ training requirement shall not apply), and who owns 49% of his Center.
iii) For purposes hereof, a “First Partial Generation Center” means a Tiger Schulmann’s Karate Center owned and operated by a student of the Company’s Tiger Schulmann’s Karate Center which does not qualify as a “First Full Generation Center” (e.g. because the employee or the student owns less than 49% of their respective Centers, or the student, if a Sensei, was not trained without interruption from the rank of a white belt to a black belt by the Employee); and a “Second Partial Generation Center” means a Tiger Schulmann’s Karate Center owned and operated by a student of a “First Full Generation Center” or a “First Partial Generation Center” who owns less than 49% of his Center or, if a Sensei, was not trained without interruption, from the rank of a white belt to a black belt by the First Full Generation Center” or the “First Partial Generation Center.”
There was no change to the computation of the commissions payable to the employee by UAK, namely 20% of UAK’s net management fee received by UAK from a First and/or Second Generation Centers. A second paragraph referencing the “partial” generation centers was added in the 2001 agreement as follows:
2. Employee shall also be entitled to a monthly commission of the Net Management Fee ... received by UAK ... from a First Partial Generation Center ... and a Second Full Generation Center ... The amount of said monthly commission shall be mutually agreed upon by UAK ... and all others concerned. Notwithstanding anything to the contrary contained herein, the determination of UAK ... with respect to the payment of commissions for “First Partial Generation Centers” and “Second Partial Generation Centers,” shall be final, binding, and conclusive on all parties.
After 2001, Schulmann began to organize the opening and operating of karate schools as a franchise by and through TSK, a New Jersey S corporation, of which Schulmann was (and still is) President and sole shareholder.[4] The essence of the arrangements remained the same, except that the corporate school becomes a franchisee, TSK undertakes to manage the franchisee’s accounting, check-writing, and other services for a fee, and a “Shareholder Agreement” is used instead of the Employment Agreement. Further, TSK, not the corporate school, undertakes *579 to pay the franchisee instructor “referral” fees.[5] Last, the referral fees is 20% of the net profits of the First and Second Generation Centers (less TSK’s charges for managing and operating services performed for and on behalf of the school), or a mutually agreed to amount with respect to “partial” generation centers, however, an instructor who was a 100% owner of the karate school (thus operating under the Standard Franchise Agreement) is entitled to a 3% commission.
Although pursuant to the earlier Employment Agreements and later franchise arrangements, the corporate school or TSK was obligated to pay the commissions/referral fees, Sehulmann testified that he personally ensured these payments were made to the instructors by paying the same out of his share of income from the karate schools. He stated that he did so to quell his instructors’ misgivings that their commissions could be in jeopardy since their payment was dependent upon UAK’s net management income from the corporate schools. He testified that the employee/owner’s entitlement to 10% of the net profits from each of the other two schools (for a total of 20%), was guaranteed by him in that he personally undertook to pay this 20% amount from and out of his share of profits from the other two schools. Thus, there was no issue that if UAK did not have monies to pay the commissions, they would not be paid. Sehulmann would pay it personally. No written agreements, if any, were provided to the court in this regard.
To accomplish this verbal guarantee/assurance, Sehulmann testified that his share of income/profits from various corporate schools were deposited into an account designated “Danny Schulmann/UAK.” Sehulmann stated that he understood this to be a “distribution account” into which his share of income/profits from all the corporate schools were deposited and from which distributions were made as commissions to the instructors. He testified that he kept this account “clean” in that it was used exclusively to *580 satisfy the commission obligations. He never used the account to pay any personal expenses. Schulmann further testified that the bank account essentially zeroed itself out (his profits less distributions).
Copies of cancelled monthly checks for 2000 and 2001, and some of the monthly checks for January 2002, evidenced payments made to various individual owners/operators of a karate school. Monthly cheeks were also issued in favor of Schulmann. All these checks bore the account name “Danny Schulmann/UAK” with the business address, namely, 40 Eisenhower Drive, Paramus. The checks bore the notation “commission” or “commissions” and the month for which the commission was paid. Some of the checks (issued in 2000 and 2001) were made payable to UAK. These checks bore the notation “Shihan commission.”[6]
A spreadsheet was included showing a summary of the total commission/management fee payments. For 2000 and 2001, the spreadsheet was titled “Management Fee Distributions” and showed, month-wise (from December of the prior year to November of 2000/2001) the checks issued or paid to individuals, including Schulmann. Two line items also included checks paid to UAK “DS” (totaling $966,882 in 2000 and $656,189 in 2001) and UAK “SB” (totaling $71,300 for 2000 and $85,800 in 2001). From the total of these payments, a deduction was made for the checks paid to UAK “DS” as being towards “Shihan Payroll taxes (UAK Mgmt).”[7] A further deduction was made of the cheeks paid to Schulmann as being towards “Shihan Mgmt Fees Reelass to Distributions” ($690,122 for 2000, and $697,390 for 2001). The balance was deemed the “net management fee distribution” in the amount of $974,524 for 2001 and $863,571 for 2001 (which amounts were used to offset Schulmann’s income from S corporations, partnerships, see infra). *581 For 2002, the spreadsheet did not contain any deductions. Titled “DSUAK Income Expenses,” it listed by month, and person, the amount of commissions paid for the period December 2001 to January 2002. It showed $449,845.23 as the “Total Mgmt Fees Dist.” For the period February 2002 to November 2002, the spreadsheet was titled “TSK Franchise Systems, Inc. Report of 2002 Commission Fees.” This summary also listed by month and individual, the amount of “management fee” paid. The total of the “commission fees paid in 2002” was listed as $2,184,676.99.
Schulmann did not sign any of the checks issued from the “Danny Schulmann/UAK” account. Rather, all checks were signed by Mr. Sachs on behalf of UAK. Mr. Sachs testified that UAK had its own checking account and did not mingle its transactions in this bank account.

Tax Returns

For all the tax years at issue herein, Schulmann conceded that there was never a corporate level deduction (by UAK or TSK or any corporate school) for the commissions paid. Rather, for each tax year, Schulmann deducted these expenses on his personal income tax returns.
Thus, for each tax year, Schulmann’s personal income tax returns (federal and GIT) reported a net amount of income from “partnerships, S corporations ... etc.” The explanatory attachment showed the computation of the net amount by listing the income from various karate schools (all S corporations), such as for example, Bayside Karate, Inc., losses from non-school partnership entities, and a passive loss from UAK. In addition, a separate line item showed a deduction for “Commissions Paid on Schedule E income.” This amount was $974,524 for tax year 2000 (the same amount shown as the “net management fee distribution” in plaintiffs’ spreadsheet); $863,571 for tax year 2001 (the same amount shown as “net management fee distribution” in plaintiffs’ spreadsheet), and $1,025,878 for tax year 2002 (as compared to the $2,184,676.99 claimed to be the “total commission fees paid in 2002” in plaintiffs’ spreadsheet). No income or loss was reported *582 on the line item “business income or (loss) ... Schedule C” for any of the tax years at issue.
For tax year 2000, Schulmann issued forms 1099-MISC (federal information reports) indicating the commissions paid to each instructor. The forms showed Schulmann as the payor, Schulmann’s residential address and his social security number. Schulmann testified that these forms were prepared and filed by his accountant, and he had no personal knowledge of why these reports were filed in this manner.[8]

GIT Assessments

For each tax year 2000 to 2002, the Director issued a notice of deficiency for GIT against Schulmann denying an offset of the commissions against the passed through S corporation income. The Director explained that the commissions “paid by Schulmann to the various Karate schools” were “[personal expenses” and hence “not deductible.” An offset was denied because “[although the expenses are related from the S Corporations, they were not incurred by the S corporation.” The denial of this deduction resulted in an increase to Schulmann’s passed through pro-rata share of S corporation income.[9] This in turn led to an assessment of additional GIT (plus interest and penalties).
Schulmann timely filed an administrative protest claiming that the commission expenses while paid by Schulmann were “not personal in nature.” Under the franchise arrangement, TSK (“formerly UAK”) had to pay a referral fee, and therefore, “[ultimately, it is the [corporation that is responsible for the payment of these fees.” Thus, Schulmann, merely “acted as [an] agent[ ] for the S corporations [he] partially own[s]” in making the pay *583 ments. Therefore, the commissions were properly allowable offsets to the S corporation income both under the Internal Revenue Code (“I.R.C.” or “Code”), and under the GIT. Alternatively, these expenses should be deductible under I.R.C. § 162 as ordinary and necessary business expenses.
After an administrative conference, the Director issued a final determination upholding the audit. The Director reasoned that a deduction for commissions would ordinarily constitute an acceptable corporate business expense however, since they were paid by Schulmann and not the S corporations, such a deduction could not be used by Schulmann to offset the passed through S corporation income. Having made a business decision to choose a corporate form of business undertaking, a taxpayer could not avoid the corporate form when the same resulted in unfavorable tax consequences. The final determination computed the GIT liability, plus interest, late payment penalty and amnesty penalty, less credits, in the amount of $93,518; $77,400 and $79,031 for each of the tax years 2000, 2001 and 2002.
The parties submitted pre-trial briefs requesting the same be considered in support of their respective motions for summary judgment. The court denied the motions on grounds that facts needed to be established as to the nature of the commissions, the manner in which they were paid and the reasons for the same. Accordingly, the court heard the testimony of Schulmann and Mr. Sachs. At the end of the testimony, the Director moved for directed verdict. The court denied the same on grounds that the testimony raised issues on the tax treatment of these commission payments, and the court needed to weigh all the evidence before making a determination. See R. 4:37-2(b).

FINDINGS

The GIT Act imposes a tax on the “gross income” of individuals. N.J.S.A. 54A:2-1. The types of income subject to tax are categorized in N.J.S.A. 54A:5-1. These categories of income are taxed either on a net basis or a gross basis. Smith v. Director, Div. of Taxation, 108 N.J. 19, 32, 527 A.2d 843 (1987).
*584 A taxpayer’s pro-rata share of the passed through S corporation income is taxed on a net basis. N.J.S.A 54A:5-l(p). GIT is imposed upon a shareholder’s pro-rata share of “S corporation income, dividends and gain ... whether or not distributed ...” N.J.S.A. 54A:5-9.
The term “S corporation income” is defined as “the net of an S corporation’s items of income, loss or deduction taken into account by the shareholder in the manner provided in” I.R.C. § 1366, but without certain specific items of deductions. N.J.S.A. 54A:5-10. Thus, after the S corporation has determined its net income (gross income less allowable deductions under the Code, see I.R.C. § 1366, plus certain non-allowable deductions, see N.J.S.A. 54:5-10), the shareholder is taxed under the GIT Act on his share of such income.
From the pre-2002 Employment Agreements, it is clear that each corporate school was obligated to pay the commissions to the instructor/owner (although the amount of the commissions was computed as a percentage of UAK’s net management income after expenses). Similarly, the 2001 franchise Offering Circular evidences that TSK undertook to pay the referral fees to the instruetors/owners. However, Schulmann concedes that no corporate entity (be it the corporate school, UAK or TSK) deducted any expenses for commissions. Although Schulmann certified that payments from February 2002 onwards were made from TSK’s checking account, no checks showing payments as being generated or made by TSK were produced to support this statement.[10] Clearly then, the commissions were not reported as a corporate business expense incurred by a corporate entity.
*585 Schulmann credibly testified that he used his share of the monthly net income of each school to pay commissions, and only his share of such income was deposited into the Danny Schulmann/UAK checking account. The testimony was corroborated by Mr. Sachs who testified that UAK had a separate checking account and UAK’s income was not eo-mingled in the Danny Schulmann/UAK checking account. Nothing was provided to the court to show that UAK’s income/profits or the corporate schools’ income/profits were deposited in this account.
The monthly checks show that commissions were paid out from this account. This was corroborated by the testimony of both Schulmann and Mr. Sachs that no other payments were made out of this account. Although UAK had its own separate checking account, nothing was provided to the court to show that commissions were paid out of such separate account. While it appears that the Danny Schulmann/UAK account was operated by UAK insofar as Mr. Sachs signed the commission checks, and UAK paid itself cheeks towards “Shihan payroll taxes,” nothing was provided to the court to show that UAK paid any of its vendors or any other business expense from this account. Mr. Sachs signature on the commission checks does not alter the fact that the monies used to pay the commissions were only from Schulmann’s share of income. Similarly, that the account was never used by Schulmann for his personal expenses does not negate the fact that the commissions were paid from Schulmann’s share of profits/income from the karate schools.
Thus, the issue before the court is whether Schulmann’s payment of commissions from his pro-rata share of S corporation income from the various karate schools, allows him to offset or reduce such income because the commissions were the contractual obligations of the corporate school/UAK/TSK. Schulmann contends he must be allowed to do so because (a) he is a 100% shareholder of UAK/TSK, thus, he and the corporation are one and the same,[11] or (b) he made the payments on behalf of the *586 corporate entities, thus, they qualify as business expenses, entitled to a deduction.
The argument for disregarding the corporate form was advanced and rejected in Sidman v. Director, Div. of Taxation, 18 N.J.Tax 636 (Tax 2000), aff'd, 19 N.J.Tax 484 (App.Div.), certif. denied, 170 N.J. 387, 788 A.2d 772 (2001). There, the Appellate Division ruled that an S corporation shareholder cannot reduce his passed through share of S corporation income by the interest on a loan obtained by him individually to purchase an interest in the S corporation. Citing to Dantzler v. Director, Div. of Taxation, 18 N.J.Tax 490 (Tax 1999), the taxpayer argued that if a partner in a partnership (a pass-through entity) was allowed an identical deduction, then, a shareholder in an S corporation (also a pass-through entity) should also be allowed the same. The Appellate Division rejected this argument stating:
[Partners are taxed as if they were sole proprietors. Logically, if the partnership itself has no legal significance for purposes of New Jersey’s gross income tax law, then whether the partnership itself borrows the money, or the partner borrows the money for a purpose related to the partnership’s business, is immaterial.
In contrast, in corporate law, the corporation has a separate and distinct legal identity apart from that of its shareholders, officers, and directors.... Certain legal advantages spring from the corporate form of business ownership, including insulating the shareholders from the liabilities of the corporation.
[Sidman, supra, 19 N.J. Tax at 492]
The court was un-persuaded that an S corporation’s pass-through nature required a merging of identities of the entity and its members. Rather, unlike a partnership, an S corporation is imposed a corporate-level tax (albeit at a lower rate), thus, “the legal separateness of S corporations and their shareholders militates against treating the interest paid by a shareholder to purchase stock in an S corporation as an expense of the business and, therefore, deductible.” Id. at 493. See also, Kaplan v. Director, Div. of Taxation, 23 N.J.Tax 594, 604 (Tax 2008) (rejecting taxpayers’ arguments that the losses from their single member limited liability companies should be taxed under the category of partnership income even if the tax returns reported such income as individual business income), aff'd, 24 N.J.Tax 415 (App.Div.), certif. denied, 199 N.J. 516, 973 A.2d 384 (2009).
*587 Schulmann argues that, alternatively, he should be allowed a deduction under N.J.S.A 54A:5-l(b) (which taxes the category “net income from the operation of a business, profession or other activity”). He maintains that he made the commission payments on behalf of the corporate entities, and thus, purely for business purposes.[12] Since his income from the karate schools is purely “business” income, N.J.S.A. 54A:5-l(b), which taxes income on a “net” basis, permits offset of his commission payments.
This argument also has no legal support under the GIT scheme. N.J.S.A. 54A:5-2 prohibits inter-category netting. The statute specifically states that a “not loss in one category of gross income may not be applied against gross income in another category of gross income.” See also, Sidman, supra, 19 N.J.Tax at 487 (N.J.S.A. 54A:5-2 “matches types of income with types, of losses”). Here, this means business losses categorized in N.J.S.A. 54A:5-1(b) (the statute Schulmann is relying upon as authority for deductibility of the commission payments) cannot be used to reduce Schulmann’s pro-rata share of S corporation income taxable under category N.J.S.A. 54A:5-l(p).
Moreover, Schulmann never reported any income/loss under N.J.S.A. 54A:5-l(b) for any of the tax years at issue. Therefore, his resort to the application of this statute implicitly requires reclassifying the pass-through S corporation income as net profits/loss from a business. However, doing so is an attempt to *588 indirectly accomplish what Sidman, supra, specifically rejected, namely, ignore the corporate form and operation, simply in order to be able to deduct expenses. See also Kaplan, supra, 23 N.J.Tax at 604 (rejecting taxpayers’ attempt to reclassify income as derived from a partnership because they “did not treat their ownership ... as being in the form of partnerships for any purpose or in any context other than in connection with their efforts to reduce their New Jersey gross income tax liability.”); General Trading Co. v. Director, Div. of Taxation, 83 N.J. 122, 134-35, 416 A.2d 37 (1980). Note that such an attempt would also render false the corporate income tax returns filed by the S corporations (wholly or partially owned by Schulmann), since all tax returns are filed under penalties of perjury.
Schulmann’s reliance upon federal ease law permitting an I.R.C. § 162 deduction for payments made by an individual on behalf of a corporation, is unavailing. First, the GIT is not patterned after the Code, and deductions allowable federally are not automatically allowable for GIT purposes. Smith, supra, 108 N.J. at 32-33, 527 A.2d 843. The fact that the GIT statute has separate categories of taxable income and prohibits inter-category netting of such income/losses, necessarily means that federally permitted offsets/deductions are not translated into offsets/deductions under the GIT Act.
Second, even if federal income tax principles of the ordinary and necessary business expense deduction are applicable to the GIT Act due to the specific incorporation of I.R.C. § 1366 in N.J.S.A. 54A:5-10,[13] such a deduction is not allowable at an individual level. *589 The incorporation of I.R.C. § 162 in I.R.C. § 1366, and thus in N.J.S.A. 54A:5-10, simply means that the S corporation is permitted to take such a deduction at the corporate level so as to offset corporate income (which net income is then passed through to the shareholder). See e.g., Adler v. Director, Div. of Taxation, 20 N.J.Tax 537, 545 (Tax 2003) (allowing S corporation shareholders the benefit of the passed-through charitable contribution deduction, because unlike Sidman, supra, the “deductions at issue ... were made by the S corporation and, therefore ... deductible in calculating the corporation’s tax liability. These deductions pass through to plaintiffs in calculating their net pro rata share of the corporation’s income.”).
Last, the general rule in federal case law itself is that a taxpayer cannot individually deduct expenses paid on behalf of another. Whipple v. Commissioner, 373 U.S. 193, 202, 83 S.Ct. 1168,10 L.Ed.2d 288 (1963). To the extent the federal courts have carved out a narrow exception, see, Lohrke v. Commissioner, 48 T.C. 679, 688 (U.S. Tax Ct.1967) and its progeny, it applies only if the taxpayer shows that the purpose of his making payments on behalf of another “was to protect or promote his own, business, realizing a return on his payment through continued profits in that business.” (emphasis added). Here, Schulmann did not have a business or a sole proprietorship which is separate or independent from that of the karate schools, and which he was seeking to protect by making payments on behalf of UAK/TSK. Rather, he seeks ignore the corporate form of business specifically undertaken to operate the karate schools, and in order to justify a deduction under N.J.S.A. 54A:5-l(b), have this court treat those corporate schools as his sole proprietorship. This result is impermissible.[14] See also, Deputy v. du Pont, 308 U.S. 488, 494, 60 S.Ct. 363, 84 L.Ed. 416 (1940) (the business of a corporation cannot be regarded as the business of its shareholders and “well estáb *590 lished decisions of this Court do not permit any such blending”). Therefore, federal case law does not assist Schulmann.
Schulmann notes that even if he were denied the ability to deduct the commission payments as ordinary and necessary business expenses, he should be able to treat those payments as capital contributions to UAK/TSK. Such treatment is entirely possible. See e.g., I.R.C. § 1016(a)(17) (adjustment should be made to basis “to the extent provided in section 1367 ... in the case of stock of, and indebtedness owed to, shareholders of an S corporation”); Craft v. Commissioner, T.C. Memo 2005-197 (T.C. 2005) (“voluntary payment of corporate expenses by officers, employees, or shareholders may not be deducted on the taxpayer’s individual return ... [but] constitute either capital contributions or loans to the corporation and are deductible, if at all, only by the corporation.”) (citations omitted). However, this would still prevent a current deduction since contributions to capital are treated as acquisition of a capital asset (interest in an entity). Any recovery of the same will occur when such interest is sold, liquidated or disposed, and to the extent the gain on such disposition represents a return of capital, the same cannot be taxed. See Koch v. Director, Div. of Taxation, 157 N.J. 1, 722 A.2d 918 (1999).
An Order will be entered by this court in accordance with this opinion affirming the Director’s assessment.

 This is a formal version of the letter opinion issued by the court on November 9,2010, and contains minor stylistic and typographical changes.

 Debbie Schulmann is a party to the proceeding solely by reason of her filing a joint GIT return with her husband, therefore, this opinion will refer to only Daniel Schulmann (hereinafter “Schulmann”).

 Schulmann had been nicknamed “Tiger” by his martial arts instructor, and therefore, incorporated this reference when naming his unique method, and thereafter, his karate schools.

 Schulmann provided the court with a sample Uniform Franchise Offering Circular, and a Joint Venture Franchise Agreement. The Franchise Circular states that TSK was incorporated in 2001, and began to offer franchises from January 2002. TSK’s business address was 40 Eisenhower Drive, Paramus and 221 West Grand Ave, Montvale.

 The undertaking is contained in the Franchise Circular as opposed to the sample Joint Venture Franchise Agreement. The sample Shareholder's Agreement has no provisions addressing commissions or referral fees.

 Schulmann was referred to by the title "Shihan" in the Employment and Franchise Agreements.

 For 2000, the $71,300 payments to UAK "SB” was also deducted as payroll taxes paid by UAK on behalf of Boysk, an instructor/owner of one of the karate schools. No such deduction was made in 2001 for $85,500.

 The Summary and Transmittal (Form 1096) accompanying the tax year 2000 forms 1099-MISC, was signed by one Gary Nafash, with a telephone number of 201-368-0707, who stated his title as "Controller.” The Schulmanns’ 2000 personal income tax return (as well as UAK’s 2001 corporate income tax return) was prepared by the accounting firm of Becher, Della Torre, Gitto & Co., with a different telephone number of 201-652-4040.

 Certain other deductions or losses were also denied/adjusted, none of which are at dispute in this litigation.

 Schulmann provided a copy of TSK's 2002 corporation income tax return (U.S. 1120S). An attached statement showed a deduction of $2,393,109 for "management fees.” Schulmann was unable to answer the court's query as to an explanation of this line item, and whether the same had anything to do with commissions payable to the karate school instructors. If this amount was deducted at the corporate level as being commissions paid by TSK to the instructors, then Schulmann’s attempt to further deduct such commissions is impermissible.

 Note that Schulmann is not a 100% owner of each karate school, but a controlling shareholder.

 Schulmann notes that the Director has conceded to the commission expenses being "classified as acceptable business expenses incurred by the corporation.” The Director notes that this only means that these expenses would be deducted in computing the corporation's net income, however, Schulmann cannot deduct the same since they are his personal expenses. Note that the court rejects the Director's position that the "personal" nature of the expense is evidenced by the forms 1099-MISC because they were issued with Schulmann’s name, home address and personal social security number. Forms 1099 are purely informational reports, intended to ensure reporting and taxation of income rather than ascertaining the validity of expense deductions. Further, these forms are required to be filed by persons who are "engaged in a trade or business" and make payments of $600 or more "in the course of such trade or business to another person.” I.R.C. § 6041(a). Additionally, the Code permits such information returns to be filed on behalf of another person. I.R.C. § 6041(e).

 I.R.C. § 1366 permits an S corporation to deduct ordinary and necessary business expenses allowable under I.R.C. § 162, in computing its net income. See I.R.C. § 1366(a)(1); (2) (tax is upon a shareholder's share of "separately" and "nonseparately" stated items of income/loss/deductions; "nonseparately" computed income or loss is gross income less "deductions allowed to the corporation under" Chapter 1 of the Code; Chapter 1 (Subchapter B, Part VI) allows as a deduction, ordinary and necessary business expenses. I.R.C. § 162). Note however, that the GIT would generally control the allowance of certain expenses deemed non-deductible for GIT purposes. N.J.A.C. 18:35-1.5(0(2); Sidman, supra, 19 N.J.Tax at 488.

 In Lohrke, supra, the court specifically stated that the taxpayer was "not attempting to disregard the corporate" form of the entity for whose benefit he had made a payment. Rather, the taxpayer made the payment to protect his “individual licensing business." 48 T.C. at 688-89.