127 F.3d 643
 80 A.F.T.R.2d 97-7379, 97-2 USTC P 50,859
 NORTHWESTERN INDIANA TELEPHONE COMPANY, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
Robert G. MUSSMAN and Estate of Myrtis Mussman, Deceased,
Robert G. Mussman, Executor, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 Nos. 97-1021, 97-1056.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 3, 1997.
Decided Oct. 22, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Jan. 7, 1998.
 
 David J. Duez (argued), Gail H. Morse, McDermott, Will & Emery, Chicago, IL, for Petitioners-Appellants.
 Richard Farber, Gary R. Allen, Bridget M. Rowan (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, Marjory A. Gilbert, Chicago, IL, for Respondents-Appellees.
 Before COFFEY, CUMMINGS, and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 These consolidated cases involve a difference of opinion between the Commissioner of the Internal Revenue Service and certain taxpayers about how far the concept of a business purpose can be pushed in the Internal Revenue Code. The two issues in the cases are otherwise unrelated tax questions and arise out of the conclusions of the Tax Court: first, that certain litigation fees Northwestern Indiana Telephone Company, or NITCO, expended in cases arising out of an FCC action were not deductible as ordinary and necessary business expenses, but rather were constructive dividends to NITCO's controlling shareholder, Robert Mussman; and second, that NITCO's accumulated earnings and profits were not related to the reasonable needs of its business and were thus subject to the accumulated earnings tax.
 
 
 2
 After receiving deficiency notices, NITCO as well as Robert and Myrtis Mussman filed petitions in the Tax Court. The cases were consolidated, and following a 7-day trial the Tax Court issued a lengthy decision upholding deficiencies asserted by the Commissioner for tax years 1987, 1988, and 1989 against NITCO, Robert Mussman, and the estate of his wife Myrtis. The factual findings of the Tax Court will, of course, not be disturbed unless they are clearly erroneous. Pelton Steel Casting Co. v. Commissioner, 251 F.2d 278 (7th Cir.1958), cert. denied, 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed.2d 1066.
 
 
 3
 NITCO, a closely held corporation in Hebron, Indiana, is an independent telephone company providing local service to five small communities in rural northwestern Indiana. Mr. Mussman owns 95 percent of the stock in NITCO and his brother owns the other 5 percent. In fact, the Mussman family has owned the company for 50 years, and for a good portion of that time the company was not especially lucrative--its 1951 net income, for example, was only about $9,800. However, after Interstate 65, the roadway that runs from Gary, Indiana, through the midsection of the Hoosier State to Louisville, Kentucky, was completed, the population the company served increased; more importantly, the breakup of AT & T added to its revenues. NITCO's annual revenue in 1987 exceeded $5 million. By 1989 NITCO had 8,634 access lines, but even then only 16 were multiline business customers. For 40 years--1954 through 1994--NITCO did not declare a dividend. Even when the company became more profitable, however, the earnings were not distributed, and as a result, NITCO's earnings and profits began to pile up, from $3,929,694 in 1983 to $15,250,005 a decade later in 1993.
 
 
 4
 Robert Mussman's two sons--Kyle and Rhys--have at times been employed by NITCO, and at other times both pursued their own business ventures. Kyle was involved primarily in cellular phone businesses and Rhys was involved in a cable television company. It is Rhys' activities which have primary relevance to the first issue before us.
 
 
 5
 In April 1983 Rhys incorporated NICATV (Northwestern Indiana CableVision) to provide cable service in rural northwest Indiana, including to some towns served by NITCO. Rhys was NICATV's president and sole stockholder. NITCO had no interest in NICATV but subsidized the company in a variety of ways, which we will mention in a moment.
 
 
 6
 In October 1983 Comark Cable Fund III, a competitor of NICATV, filed a complaint with the FCC alleging that NICATV and NITCO were affiliated companies engaged in anticompetitive conduct in violation of the Communications Act. During the relevant time, FCC rules prohibited a local telephone company from offering cable television services within its telephone service area. The FCC rules said "affiliation" means any financial or business relationship whatsoever between a telephone carrier and a cable system, and affiliation of this sort is forbidden. In regard to Comark's complaint, the FCC concluded that § 214(a) of the Communications Act was violated, and NITCO and NICATV were ordered to divest themselves of the cable television facilities and to negotiate a good-faith settlement with Comark. NITCO was fined $20,000. Ultimately the FCC orders were upheld on appeal to the Court of Appeals for the District of Columbia Circuit. The Supreme Court denied a petition for certiorari.
 
 
 7
 NITCO and NICATV refused to comply with the FCC orders during the appeal process even though the court of appeals denied a stay. Therefore, the government brought an enforcement action in the District Court for the Northern District of Indiana, and meanwhile, in that same court, NITCO and Rhys brought a separate action alleging constitutional violations.
 
 
 8
 All of this litigation, of course, resulted in substantial fees. NITCO deducted fees in excess of $700,000 paid to the various attorneys as business expenses. The Commissioner disallowed the deductions and the Tax Court sided with the Commissioner.
 
 
 9
 Title 26, U.S.C. § 162, allows a deduction for "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." But the taxpayer has the burden of showing that the expense was both "necessary" and "ordinary." The burden is a real one because deductions are "a matter of legislative grace." INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992); A.E. Staley Mfg. Co. v. Commissioner, 119 F.3d 482 (7th Cir.1997). Although often the determination which must be made is whether the item is deductible as an expense or whether it is a capital expenditure, in this case the issue is whether it is a business expense or a personal expenditure. The Tax Court concluded that it was a personal expenditure and said, "[B]efore, during, and after the years in issue, NITCO engaged in extensive nonbusiness-related activities to benefit and support Mr. Mussman's sons."
 
 
 10
 NITCO contends that this statement--a scant two lines in a 90-page decision--was an error of law because it shows that the Tax Court conducted an inquiry into motivation, which is forbidden, and that the court failed to look at the origin of the claims as required by United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963).
 
 
 11
 In Gilmore, the undisputed leading case on this issue, the Court said that, in making a determination as to whether an expenditure is for business purposes or for personal purposes, one must look to the origin and nature of the claim, not the potential consequences of the litigation to the taxpayer. Gilmore, the taxpayer, tried to deduct as an ordinary and necessary business expense the litigation costs of his divorce because in the divorce action his wife was claiming a community share of his assets, primarily controlling interest in three GM dealerships. Gilmore wanted to defeat the claims because his loss of control of the corporations might cost him his corporate positions and thus his livelihood. He also claimed that his wife's "sensational and reputation-damaging charges of marital infidelity" might cause GM to cancel the franchises. Even though Gilmore argued that through the litigation he was trying to preserve his corporations, the Court determined that the claim did not arise in connection with his profit-making activities.
 
 
 12
 We are convinced that in the case before us the Tax Court was looking--as is proper--to the origin of the claim and whether it grew out of the profit-making activity of NITCO. We agree that the origin of the claim did not involve NITCO's profit-making activities; in fact, it had nothing to do with NITCO's profit-making activity. Rather, it had to do with Mussman's assistance, through NITCO, to Rhys's business venture. NITCO, itself, could not enter the cable market. Its involvement with NICATV, far from being profit-driven, was a subsidy to Rhys' company. NITCO paid Rhys' salary, which it justified by saying that Rhys was providing consulting services. Some NITCO employees constructed and operated NICATV. NICATV leased office space from Robert Mussman for $150 per month while NITCO paid NICATV's utility bills to the tune of $6,000 in 1988 and $3,000 in 1989, for which there is no evidence of reimbursement. NITCO wrote off as uncollectible a debt of $122,000 owed it by NICATV in spite of the fact that Rhys sold the company for $4 million. A contract regarding the use of NITCO poles for cable and office space came into existence only after Comark brought its FCC complaint. The fact that after the FCC got wind of what was going on NITCO was required to defend itself against a possible fine is really a consequence of its gratuitous action; it does not transform NITCO's involvement with NICATV into a profit-making activity. The claim in this case originated with the nonbusiness activity of underwriting Rhys. In short, the Tax Court got it right; these are not ordinary and necessary business expenses. It follows then that they are, as the Tax Court found, constructive dividends to Robert Mussman.
 
 
 13
 We now move to the other issue, whether NITCO allowed its earnings to accumulate beyond the reasonable needs of its business. If it did, then it becomes liable for the accumulated earnings tax.
 
 
 14
 Whether NITCO was avoiding the payment of income taxes by accumulating earnings and profits beyond the reasonable needs of its business is a question of fact reviewed for clear error. Engineering Corp. of America v. United States, 284 F.2d 302 (7th Cir.1960).
 
 
 15
 The tax, imposed by § 531 of the code, is to discourage corporate retention of earnings for the purpose of avoiding the individual income tax on distributions of dividends to shareholders. Ivan Allen Co. v. United States, 422 U.S. 617, 95 S.Ct. 2501, 45 L.Ed.2d 435 (1975). The purpose is to compel corporations to distribute profits not needed for the conduct of its business. United States v. Donruss, 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969). The fact that a corporation permits earnings to accumulate beyond its reasonable needs is "determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." § 533. However, tax avoidance need not be the primary or only purpose of accumulation of earnings, but merely one purpose.
 
 
 16
 We can look to the income tax regulations for guidance in our inquiry. The regulations say that in order for a corporation to justify an accumulation of earnings and profits there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of the funds. 26 C.F.R. § 1.537-1(b)(1). Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of a plan is postponed indefinitely, the accumulation cannot be justified as necessary for the reasonable needs of the business. 26 C.F.R. § 1.537-1(b)(1). Circumstances which suggest that the earnings and profits are being accumulated include loans to shareholders, expenditure of corporate funds for the personal benefit of shareholders, loans without a reasonable relation to the business and made to relatives or friends, and retention of earnings and profits to insure against unrealistic hazards. 26 C.F.R. § 1.537-2(c).
 
 
 17
 As with the first issue on this appeal, the analysis of this issue is highly fact-specific. It is necessary to look at the facts regarding improvements made to the company and its anticipated future needs for revenue to determine whether NITCO's accumulated earning were reasonable. In its petition commencing its case in the district court NITCO did not allege any specific business needs for which it was accumulating its earnings. NITCO had no contemporaneous records indicating plans for the use of the accumulated earnings. However, during pretrial discovery on March 4, 1992, it claimed that it needed the accumulated earnings because it planned to replace its switching equipment, to acquire certain signaling technology, to offer services such as call forwarding, to save for increased services in the event that a new airport were built near NITCO's service area, to save for expansion of its principal office facilities, and to purchase a computer for billing purposes.
 
 
 18
 Testing these claims against NITCO's actions, we see that it is true that during the 1980's NITCO underwent some changes. It moved its Hebron business headquarters from one building to a larger one that was just down the street. However, both buildings in which the company was housed were owned by Robert Mussman. After the company moved to new quarters, the old offices were used by NITCO for storage or leased to Rhys' cable television company.
 
 
 19
 In 1986 NITCO's responsibility for billing of customers was reduced by AT & T's assumption of the task of billing for long-distance service. In 1989 NITCO contracted out the local billing to the Bank of Illinois and was still utilizing the bank's services in 1991. It was not until 1992 that NITCO spent about $780,000 for a new computer to allow it to handle its own billing.
 
 
 20
 During 1985 to 1988 NITCO replaced its old switching equipment with new digital equipment manufactured by a French company called Alcatel. When the change was made in the switching equipment, NITCO paid off the remaining debt of $669,530 owing on its old equipment. The new equipment gave NITCO the ability to provide modern telephone services like three-way calling and call forwarding. NITCO represented in its publications circulated to its customers that the Alcatel equipment was state of the art. Between 1987 and 1992 there is no indication that NITCO obtained bids to replace the Alcatel equipment. In 1992 NITCO obtained a bid for the price of replacement equipment but at the time of trial had not purchased any equipment to replace its still relatively new, state-of-the-art Alcatel switching equipment.
 
 
 21
 NITCO also replaced some of its copper cable with fiber-optic cable in some parts of its telephone service system, but between 1987 and the time of the trial it had not installed fiber-optic cable in residences or in the business premises of its customers. In fact, in a paper he prepared for the telephone industry in 1989, Kyle Mussman said that there was no economic justification for local telephone companies to install fiber-optic cable in residences. In addition, although during the 1980's NITCO applied for licenses for cellular phone service, the company transferred to other entitles owned by the Mussman family any rights it obtained.
 
 
 22
 The Tax Court found that no dramatic expansion of NITCO's customer base could be reasonably expected. The judge discounted the possibility of a new Chicago area airport being located in or near its service area, saying it was speculative because only 4 of the 15 possible sites for the airport were near NITCO. In short, the Tax Court found that some of NITCO's alleged justifications for the accumulated earnings were thought of after the fact--that is, after the deficiency assessment.
 
 
 23
 Also, NITCO's actual use of the funds does not show that it planned to expand. In fact, a large part of its accumulated earnings was used to fund other ventures of the Mussman family. NITCO pledged $3.6 million to Kyle's Blue Mountain Cellular Telephone. NITCO paid money to both sons even after they were no longer employed by the company. Corporate funds were used to pay Rhys' country club membership when he was no longer an employee. These findings support the conclusion that NITCO allowed earnings to accumulate beyond its reasonable needs and that it did not show by a preponderance of the evidence that it did not have a tax avoidance purpose.
 
 
 24
 But in what seems to be an attempt to avoid review under the clear error standard and to have us look at the cases de novo, NITCO also contends that the Tax Court committed an error of law when it failed to apply a "flexible standard of law" in regard to closely held corporations. The argument is that such corporations cannot be held to the same strict formalities as large public corporations. So, NITCO contends, the fact that it had virtually nothing in writing about its plans and that some of the plans seemingly were concocted after the audit began is of very little relevance.
 
 
 25
 The argument is an exercise in revisionist history. The accumulated earnings tax was originally assessed primarily against closely held corporations. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, p 7.02 (6th ed.1996). The tax was to prevent the formation of corporations to shelter individual shareholders, a much more likely event in a closely held corporation. In fact, in 1974, even though the statute then in effect did not distinguish between publicly held and closely held corporations, the Ninth Circuit declined to impose the tax on a publicly held corporation. Golconda Mining Corp. v. Commissioner, 507 F.2d 594. That result was corrected in 1984 when Congress enacted § 532(c), which provided that liability must be determined without regard to the number of shareholders. This little bit of history seems to us to send a clear message that publicly held and closely held corporations are not to be treated differently under this statute. But if they were to be treated differently, it seems unlikely that closely held corporations, with their greater incentive to shelter their shareholders, are the ones which would be treated more leniently. This remains true even now, when the tax rates for individuals and for corporations have been more closely aligned. The fact that after-tax corporate income is taxed a second time when it is distributed to shareholders provides a continuing incentive for the corporation to retain earnings. See Bittker & Eustice, p 7.01. We are not convinced that the Tax Court committed an error of law on this point.
 
 
 26
 The decision of the Tax Court is A FFIRMED.