T.C. Memo. 2012-324

UNITED STATES TAX COURT

JAMES A. CAVANAUGH, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30825-09.                    Filed November 26, 2012.

<u>George Tomas Rhodus</u>, for petitioner.

<u>Duy P. Tran</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  Twenty-seven-year-old Colony Anne (Claire) Robinson

left Texas in November 2002 for a Thanksgiving vacation in the Caribbean with her

boyfriend, his bodyguard, and another employee of the company that he had spent

decades building.

[*2]    She did not return home alive.

The coroner's report showed a massive amount of illegal drugs in her body and concluded that they were the likely cause of her death.  Robinson's mother sued the boyfriend and his company for wrongful death.  The parties settled.  The company paid most of the $2.3 million settlement directly; the boyfriend contributed $250,000, which the company then reimbursed.  The company then claimed the entire $2.3 million as a deduction, along with nearly $180,000 in related legal fees.  The boyfriend's company is a corporation that elected long ago to have its income and deductions flow through to its owner's individual return.  The parties have settled every other issue in the case, but the Commissioner is not willing to concede the deductibility of the settlement or the company's reimbursement of the boyfriend's contribution.

## Background

James Cavanaugh is the CEO and sole shareholder of Dallas-based Jani-King International, Inc., which he founded in 1969 and has built into one of the most successful janitorial-services franchisors in the world.  For the 2002 Thanksgiving holiday, Cavanaugh decided to rest from his entrepreneurial chores by going on a vacation to the Caribbean with Robinson.  They traveled to Cavanaugh's villa in St. Maarten and were accompanied by Cavanaugh's

[*3] bodyguard, Ronald (Rock) Walker,[1] and Erika Fortner, another Jani-King employee. The parties agree that the trip was for pleasure and not to conduct or further any Jani-King business. On November 28, Robinson suffered fatal cardiac arrest after ingesting a large amount of cocaine.

In August 2003 Robinson's mother, Linda Robinson, sued both Cavanaugh and Jani-King in Texas state court. She sought damages for the wrongful death of her daughter, but by the time she filed the final version of her complaint it had sprouted causes of action for negligence, assault and battery, conspiracy, premises liability, strict liability, strict products liability, negligence *per se*, and gross negligence.[2] Cavanaugh and his company each retained separate counsel for what quickly became contentious and emotionally charged litigation. Linda Robinson alleged that Cavanaugh wrongfully caused Robinson's death because he supplied the drugs--personally and through his agents Walker and Fortner--that killed her.

---

[1] Though Walker's various "security" duties appear to be wholly focused on Cavanaugh, Walker was technically employed by Jani-King. Cavanaugh provides us no evidence regarding Walker's duties for Jani-King, and but the faintest sketch of what Walker did for him personally.

[2] Over the course of amending her complaint, Linda Robinson detailed her daughter's relationship with Cavanaugh. She alleged that Cavanaugh preyed on young women, including Robinson's older sister, plied them with drugs, controlled their every move, and forced them to participate in diverse debauchery--helped along by his "vice man" Rock Walker and other Jani-King employees.

[*4] She also swept in Jani-King--according to the complaint, it contributed to Robinson's death because its employees--Cavanaugh, Walker, and Fortner--were all acting within the scope of their employment.

The Jani-King board of directors called a special meeting in September 2004. Cavanaugh insisted that the case was frivolous, but also said he was willing to contribute $250,000 to settle it. He then recused himself from the meeting to allow the board to discuss the matter. (Cavanaugh was only one of Jani-King's four directors, but he was its sole shareholder and had the power to remove any director for any reason.) Jani-King's lawyers agreed with Cavanaugh that both he and the corporation would likely win the case. The lawyers nevertheless warned that juries are unpredictable and Jani-King's reputation could be soiled if the case dragged on or became more notorious. According to the board minutes, the remaining directors were quite worried about losing the case, and worried even more that Jani-King franchisees would jump in for a second helping of litigation if they thought Robinson's suit would hurt their own businesses. As a corporate franchisor, Jani-King's income depends on a stream of royalties, so this is plausible, but we do note that the minutes don't elaborate the extent or specific

**[*5]** bases of the directors' anxiety.[3]  The Board then approved a settlement of up to $5 million, in addition to Cavanaugh's contribution.

The case trudged forward until August 2005, when Linda Robinson settled it for $2.3 million payable over two years.[4]  Cavanaugh contributed $250,000, which Jani-King promptly reimbursed; in the end he paid nothing in his individual capacity to settle the case.  And Jani-King on its 2005 and 2006 tax returns deducted the settlement amount (including the amount it reimbursed Cavanaugh) along with its own attorney's fees as ordinary and necessary business expenses.

In 2009 Cavanaugh received a notice of deficiency that raised numerous issues.  The parties settled them all, except for the disallowance of deductions for the settlement payments and legal fees relating to the Robinson suit and its settlement.  That issue was headed for trial in Dallas (Cavanaugh resided in Texas

---

[3] Cavanaugh introduced no other evidence regarding Jani-King's fear of being sued by its franchisees for publicity fallout from the Robinson litigation.

[4] Jani-King is an S corporation, and so doesn't pay taxes itself.  Sec. 1363(a).  Its taxable income is also generally calculated as if it were an individual, not a regular corporation.  Sec. 1363(b).  Thus, Jani-King accounted for its business activities using the taxable year and accounting method of Cavanaugh, its sole shareholder.  Cavanaugh is a cash-basis, and thus calendar-year, taxpayer.  See sec. 441; see also sec. 446(c).  Jani-King spread its deductions over two years because the amounts were paid over two years.  (All section references are to the Internal Revenue Code in effect for the year in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.)

**[\*6]** when he filed his petition) when the parties agreed to submit it for decision under Rule 122.

Discussion

Their failure to settle these issues is entirely understandable. From Cavanaugh's perspective, it is an unfortunate fact of business life that corporations and prominent individuals get sued, sometimes on dubious facts and theories of liability. Settling such suits may be distasteful, but even a small chance of an enormous payout may justify a deal that protects assets from the uncertainty of litigation and protects a business reputation from scandal.

The Commissioner has a different view--he argues that however jumbled and wrinkly the legal topography created by the collision of Code, regulations, and caselaw may sometimes seem, it cannot possibly hide a crevice dark enough to successfully shelter an argument that the price paid for the death of the boss's girlfriend is a deductible corporate business expense.

We must figure out two separate puzzles. We must first decide whether Jani-King can deduct its share of the settlement payments and the legal fees related to the lawsuit and settlement. Then we must decide if Jani-King can deduct Cavanaugh's $250,000 indemnification payment. We discuss each issue in turn.

**[\*7]** I.      The Settlement Payment and Legal Fees

Under section 162, a business may deduct ordinary and necessary business expenses.  Broken into its component parts, section 162 allows a deduction for any expense that is

- paid or incurred during the tax year,

- "ordinary",

- "necessary", and

- a "business" expense.

See, e.g., O'Malley v. Commissioner, 91 T.C. 352, 361 (1988).  The Commissioner does not contest the first three points.  The stipulation shows Jani-King and Cavanaugh paid the settlement costs and attorney's fees.  Those costs were "necessary" because they were "appropriate and helpful," which is how the caselaw has interpreted that word.  See, e.g., Commissioner v. Tellier, 383 U.S. 687, 689 (1966) (quoting Welch v. Helvering, 290 U.S. 111, 113 (1933)).  And courts have long considered legal fees and settlement costs, even if sporadic, to be "ordinary".  See, e.g., Tellier, 383 U.S. at 690.

It's section 162's last requirement--that the deduction be a "business", in contrast to a "personal", expense--that is the key issue.  In the context of legal expenses and costs, the question usually turns on the "origin and character of the

[*8] claim" underlying the legal controversy.  See United States v. Gilmore, 372 U.S. 39, 49 (1963).

A.    Whether Gilmore Applies

Cavanaugh's first argument is that Gilmore doesn't even apply, because "Jani-King is a business corporation which engages solely in business activities." He argues instead that we should analyze the deductibility of its expenses under Kopp's Co. v. United States, 636 F.2d 59 (4th Cir. 1980).

In Kopp's Co., 636 F.2d at 60, the son of a lumber-company president used a company car that his dad had lent him.  The son had a bad driving record, and crashed the company car into another, and seriously injured the other car's driver. Id.  The injured driver sued the son, the company's president, and the company itself.  Id.

The company settled and deducted its share of the settlement and legal fees. The Fourth Circuit agreed that it could, because the company was named in the suit and the company had "direct exposure to the risk of a monetary judgment." Id. at 60-61.  Many have written that this apparent focus on the *consequences* of the claim rather than its *origins* appears to conflict with Gilmore.  See, e.g., Kopp's Co., 636 F.2d at 61-62 (Ervin, J., dissenting); "Note:  Federal Taxation-- The Deductibility of Legal Expenses in the Fourth Circuit-*Kopp's Co. v. United*

**[*9]** *States*," 17 Wake Forest L. Rev. 1008, 1017 (1981); "Note:  The Transaction Approach to the Origin of the Claim Doctrine:  A Proposed Cure for Chronic Inconsistency," 55 Brook. L. Rev. 905, 940-41 (1990) (suggesting misapplication of the origin-of-the-claim test).  Appellate venue in this case, however, would normally lie in the Fifth Circuit.  While that circuit uses the origin-of-the-claim test like everyone else, see Estate of Meade v. Commissioner, 489 F.2d 161, 166 (5th Cir. 1974) (applying the "origin standard" to determine whether an antitrust claim was deductible or capitalizable, rev'g T.C. Memo. 1972-190), Cavanaugh is correct that it doesn't have any authoritative precedent on the specific issues here.

And Cavanaugh is also correct that we ourselves have cited Kopp's Co. in later cases.  He points us to Synanon Church v. Commissioner, T.C. Memo. 1989-270, and Nw. Ind. Tel. Co. v. Commissioner (NITCO), T.C. Memo. 1996-168, 1996 WL 147915, aff'd, 127 F.3d 643 (7th Cir. 1997), for the proposition that a "a corporation engage[d] exclusively in business activities" isn't bound by Gilmore.  Both these cases, however, actually distinguished Kopp's Co. and declined to follow it.  See NITCO, 1996 WL 147915, at *29 n.16; Synanon Church, T.C. Memo. 1989-270 (Kopp's Co. distinguishable because here taxpayer engaged in substantial nonbusiness activities).  These cases do not create an exception to the origin-of-the-claim test; they apply it to particular facts to decide whether the

**[\*10]** activity involved was "business" or "nonbusiness".  Our Court has never held that naming a company as defendant in a lawsuit *ipso facto* makes legal fees or settlement costs into business expenses.  See, e.g., Synanon Church, T.C. Memo. 1989-270.

      B.      Origin and Meaning of "Origin-of-the-Claim"

This carries us back to Gilmore.  In Gilmore, a husband argued that legal fees from his divorce were ordinary and necessary business expenses because he needed to shield his business interests from his former wife's community-property claims. Gilmore, 372 U.S. at 41.  The Supreme Court held instead that deductibility "depends on whether or not the claim *arises in connection with* the taxpayer's profit-seeking activities," not on the "*consequences*" to the taxpayer "from a failure to defeat the claim."  Id. at 48.  Gilmore drew heavily on precedent holding that the costs of suits "directly connected with" or "proximately result[ing] from" a taxpayer's business were deductible business expenses.  See, e.g., Kornhauser v. United States, 276 U.S. 145, 153 (1928).

The Supreme Court also told us to focus on origins and not consequences in cases where the question wasn't whether an expense was deductible, but whether an expense was deductible or had to be capitalized.  In Woodward v. Commissioner, 397 U.S. 572 (1970), a taxpayer tried to deduct the appraisal fees

**[*11]** he incurred during a shareholder dispute. He argued that the "primary purpose" in incurring the costs was to protect his business. Id. at 577. The Court required him to capitalize the costs instead, laying down a general rule that the costs of acquiring or defending a capital asset get charged to the capital, not current-expense, part of the ledger.[5] Id. at 577-79.

We synthesized these holdings in Boagni v. Commissioner, 59 T.C. 708 (1973). In Boagni, the taxpayer challenged the Commissioner's disallowance of a deduction for legal fees under section 212. Boagni argued that the fees were deductible because they were incurred in cases involving royalty interests. We reiterated that the origin-of-the-claim standard requires an examination of all the facts and circumstances such as "the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the

---

[5] Much of the caselaw in this area arises, like Woodward, in fights over whether an expense related to a business activity should be deducted or capitalized. See, e.g., Newark Morning Ledger Co. v. United States, 539 F.2d 929 (3d Cir. 1976); Brown v. United States, 526 F.2d 135 (6th Cir. 1975); Kimbell v. United States, 490 F.2d 203 (5th Cir. 1974); Helgerson v. United States, 426 F.2d 1293 (8th Cir. 1970); Anchor Coupling Co. v. United States, 427 F.2d 429 (7th Cir. 1970). The question of whether an expense must be capitalized or can be immediately deducted usually involves facts one won't find in analyzing an expense for whether it's business or personal.

**[\*12]** controversy." Id. at 713 (citing Estate of Morgan v. Commissioner, 332 F.2d 144, 151 (5th Cir. 1964), aff'g in part, rev'g in part and remanding 37 T.C. 31 (1961)).

We've often cited Boagni, but some courts have urged caution in reading too much into the quoted passage's mention of the litigation's *objectives* and the deductions' *purposes*. The Ninth Circuit, for example, noted in Keller St. Dev. Co. v. Commissioner, 688 F.2d 675, 680-81 (1982), aff'g T.C. Memo. 1978-350, that Boagni's reference to "objectives" and "purposes" sits impermissibly close to the focus on "consequences" that Gilmore forbade and the primary-purpose test that Gilmore and Woodward rejected. We won't read our precedent to put us in conflict with the Supreme Court: As we held in Peters, Gamm, West & Vincent, Inc. v. Commissioner, T.C. Memo. 1996-186, 1996 WL 182545, at \*6, "[a]lthough we are instructed by Boagni v. Commissioner \* \* \* to consider all the facts and circumstances, we are bound by the rule established by United States v. Gilmore \* \* \* to look to the origin of the underlying claim, and not the consequences."

We have elsewhere called the test a "totality of the circumstances" test or looked at the "circumstances out of which the litigation arose." See Guill v. Commissioner, 112 T.C. 325, 329 (1999); O'Malley v. Commissioner, 91 T.C. at 362. But however we paraphrase the test, Gilmore limits what facts we can

**[\*13]** consider. We won't, therefore, look at the harm that Robinson's suit might have caused Jani-King's reputation or its other possible consequences. And in examining the factual allegations and legal theories underlying the particular claim, we don't need to decide whether they are correct. Maxwell v. Commissioner, 95 T.C. 107, 118 (1990); see also, e.g., Dogali v. Commissioner, T.C. Memo. 1995-39, 1995 WL 33280, at \*5 (not reaching the merits of the underlying claims).[6] Rather, we examine the facts as they fit in the overall context of the claim.

The deductibility of Jani-King's portion of the settlement and its legal fees turns both on what the "claim" was and whether its "origin" lay in Jani-King's business. See, e.g., Peters, 1996 WL 182545, at \*5 ("We must identify the claim that gave rise to the legal fees \* \* \* and then determine whether the claim was proximately related to the trade or business."). Our pursuit of the claim's origin

---

[6] This makes sense: Since the underlying suit settled, the facts that could have made Jani-King liable never got established, and no factfinder ever passed on the merits of Robinson's claims. To reach the unestablished merits of a case in our Court punishes those parties who settle rather than litigate, which isn't in anyone's interest. Robinson's claims aren't frivolous on their face: Under Texas law, the crucial issue of whether Cavanaugh, Walker, and Fortner were acting within the scope of their employment is a jury question. See, e.g., Arbelaez v. Just Brakes Corp., 149 S.W.3d 717, 724 (Tex. App. 2004). Jani-King could have been found liable under *respondeat superior* as Robinson asserted. See id. at 718 (company failed to prove as matter of law that scope-of-employment suit lacked merit and case was remanded for a jury trial).

**[\*14]** "does not contemplate a mechanical search for the first in the chain of events which led to the litigation," but requires instead "an examination of all the facts." Id. (citing Boagni, 59 T.C. at 713).

Neither party disputes the "claim" here: Linda Robinson's suit against Jani-King and Cavanaugh. They differ markedly, however, about the origin of that claim. Cavanaugh argues that its origin is Linda Robinson's contention that Jani-King killed Robinson by negligently allowing its employees to provide illegal drugs to her. The Commissioner disagrees and sees the origin of the claim simply as Robinson's death.

We agree with Cavanaugh that the Commissioner's view is one link too far down the chain Boagni referred to. Robinson's death alone couldn't have made Jani-King--or anyone else, for that matter--liable. Instead, as the caselaw requires, we must examine Linda Robinson's underlying allegations. See Maxwell, 95 T.C. at 118; see also, e.g., Hauge v. Commissioner, T.C. Memo. 2005-276, 2005 WL 3214581, at \*6 (examining the complaints); Peters, 1996 WL 182545 at \*6 (examining SEC's allegations); Dogali, 1995 WL 33280 at \*6 (examining the origin of the underlying claims). She made allegations about Cavanaugh, Walker, and Fortner as employees of Jani-King, but we must ask whether as Jani-King's *employees*, those three undertook business or personal activities in St. Maarten.

**[*15]** It's their actions that matter. Linda Robinson alleged it was they who gave Robinson the drugs that killed her, and while Jani-King could argue that they didn't give her the drugs or that even if they gave her the drugs, Jani-King wasn't liable under Texas law, neither of these defenses changes the fact that the conduct of these three is what precipitated Linda Robinson's suing Jani-King.

But just because we find that the origin of Linda Robinson's claim lay in the conduct of the Jani-King employees doesn't mean that Jani-King may deduct the settlement costs and legal expenses. We must also identify whether this conduct arose from Jani-King's profit-seeking activities. O'Malley, 91 T.C. at 361.

The Commissioner argues that the parties stipulated that the trip to St. Maarten involved no business conduct, and that this fact alone means that he should win. Cavanaugh argues that tort claims against company employees are nearly certain to arise in business today, and that this makes them proximately related to undertaking business operations. But Cavanaugh cites no authority to support such a broad assertion.

Cavanaugh could have tried to analogize to cases that he and the Commissioner cite for other propositions, and where we allowed deductions for the costs of litigation. See:

- **[\*16]** <u>Kopp's Co.</u>, 636 F.2d at 61 (costs of suit deductible by corporation because negligently entrusted corporate property at issue);

- <u>Dolese v. United States</u>, 605 F.2d 1146, 1151-52 (10th Cir. 1979) (divorce costs deductible because wife enjoined business of husband's paving company);

- <u>Guill</u>, 112 T.C. at 329-30 (costs of suit against affiliated insurance carrier deductible because they "entirely" related to plaintiff's insurance business);

- <u>O'Malley</u>, 91 T.C. at 362-64 (costs of defense against bribery charge deductible because they related to attempts by trucking business to influence current trucking-deregulation legislation);

- <u>Hauge</u>, 2005 WL 3214581, at \*7 (costs of defending suit brought for conspiracy to defraud deductible because it implicated ongoing business operations);

- <u>Naporano Iron & Metal Co. v. United States</u>, 6 Cl. Ct. 422, 431-32 (1984) (costs of suit resulting from fight on company property during business hours were deductible by corporation);

Each of these cases, however, involves using property actively employed in the company's *profit-seeking business* or the actual conduct of a profit-seeking business, and none buttress Cavanaugh's position.

Jani-King is a franchisor of cleaning businesses. Even if Jani-King employees gave Robinson the drugs that killed her, Cavanaugh hasn't shown how those actions arose from, furthered, or used property directly employed in, Jani-King's franchising business. That makes this case a lot like <u>NITCO</u>. The taxpayer

**[\*17]** in that case owned an independent telephone company at a time when the FCC banned them from offering cable-television services within their telephone-service area. NITCO, 127 F.3d at 645. The taxpayer owned no cable business, but allowed his two sons to use his phone company's leased office space, equipment, and employees to operate a cable business they owned. Id. at 646. He also paid their utility bills and wrote off substantial debt the cable business owed his telephone company. Id. After a competitor complained, the FCC intervened, resulting in lengthy and expensive litigation and a payment by the telephone company to the competitor. Id. at 645-46. Even though the telephone company directly supported the tortious conduct underlying the claim through its moneys, employees, and property, the Seventh Circuit refused to allow the telephone company a deduction for its costs. Id. at 646.

That court reasoned that none of the telephone company's actions involved its "profit-making activities." Id. Rather, "[i]ts involvement with [the cable business], far from being profit-driven, was a subsidy to [the telephone company's president's son]." Id. Whether or not a bodiless corporation is a "person", it certainly is controlled by flesh-and-blood people, who sometimes use corporate property for ends no reasonable person could call profit-seeking. Gilmore tells us to ferret out only profit-seeking activities and purposes. See Gilmore, 372 U.S. at

**[\*18]** 46-48.  Any other rule "carr[ies] us too far" and allows taxpayers to subvert section 262 by running their expenses through corporate forms.  Id. at 48 (citing Lykes v. United States, 343 U.S. 118, 125 (1952)).

In this case, Jani-King employees were engaged in non-profit-seeking activities that did not arise from or further Jani-King's business, and were far from any company property.[7]  We therefore hold that Jani-King's settlement costs and legal fees are personal costs and not deductible.

Rock Walker's conduct might present a closer question.  Jani-King employed him as a bodyguard, and it's conceivable that Jani-King determined his security duties furthered its business objectives.  Cf. Estate of Bartholomew v. Commissioner, 4 T.C. 349, 363 (1944) (expenses for chauffeur/bodyguard are deductible).  The record, however, contains no evidence regarding his specific

---

[7] We withhold judgment on facts similar to those in Naporano Iron & Metal Co. v. United States, 6 Cl. Ct. 422, (1984).  That case got its start in a fistfight between employees during business hours and on company property.  The fight clearly didn't support the company's profit-seeking activities, but the Claims Court noted that the claim "arose directly" from the operation of the company's profit-seeking endeavors, for "[a] necessary aspect of conducting business is the effective human interaction of company personnel. It is, thus, impossible to separate the human incidents *that occur in the course of transacting business* from the conduct of the business itself."  Id. at 431 (emphasis added).  If the Jani-King employees had been attending a conference in St. Maarten or if they had given Robinson the drugs that killed her back in Dallas, at Jani King's offices, and during business hours, our analysis might be different.

**[*19]** duties at Jani-King, and we would be hard pressed to say that he was acting within his "business" duties while on vacation in St. Maarten.[8]  What is laced throughout the record is evidence that Walker acted as Cavanaugh's personal valet, chef, confidant, and enabler--though to what extent we can only guess.  Assuming Linda Robinson's allegations are true, Walker's conduct presents us with the type of problem identified in Peters's hypothetical example of the bank executive who embezzles for personal gain:  If Walker did provide Robinson with the cocaine that killed her, did he do so to carry out his "bodyguard" duties for Jani-King?  See Peters, 1996 WL 182545, at *6.  Or, like the hypothetical fraudster, did Walker act for his own benefit or purposes?  Cavanaugh bears the burden of proof on this point, and with the scant and unreliable evidence in the record we can't conclude that it was more likely than not that Walker's conduct arose from or furthered Jani-King's profit-seeking activities.  See Gilmore, 372 U.S. at 48.

We therefore conclude that none of the Jani-King employees' conduct that Thanksgiving weekend, whether proven or alleged, arose from Jani-King's profit-

---

[8] We also have no factual basis in the settlement agreement (or any other document) to allocate a portion of the settlement only to Walker's conduct, which is what we would have to do to sustain the deduction because of his actions alone.

**[\*20]** seeking activities. Jani-King, therefore, cannot deduct the settlement costs or legal fees. See Peters, 1996 WL 182545, at \*6.[9]

## II. Deductibility of the Indemnity Payment

Cavanaugh agreed to contribute $250,000 to the settlement payment from his personal funds. Jani-King reimbursed him in full for this amount, and then deducted the payment as an ordinary and necessary business expense. We must figure out if this deduction is appropriate,[10] either because Jani-King was legally obliged to reimburse Cavanaugh, or as a voluntary payment with a sufficient business purpose.

---

[9] Cavanaugh hasn't argued that he can deduct the expenses personally. Cf. Peters, 1996 WL 182545, at \*7 n.6 (raising the issue of one of the S corporation's members personally deducting legal fees held to be unrelated to S corporation's business activities). We deem this issue waived, but also note that Cavanaugh gave us no evidence that his own conduct in St. Maarten furthered a business or profit-making objective of his own. Similarly, neither Cavanaugh nor Jani-King has argued that we need to allocate between deductible and concededly nondeductible portions of the settlement. See Guill v. Commissioner, 112 T.C. 325, 331 (1999) (litigation costs may be apportioned to deductible and nondeductible purposes (citing Kurkjian v. Commissioner, 65 T.C. 862 (1976))).

[10] Cavanaugh could have argued that the payment should be deductible by Jani-King as salary compensation to him, but he hasn't. Cf. Peters, 1996 WL 182545, at \*6 (arguing the same). We deem this argument waived but could just as easily conclude that Cavanaugh hasn't introduced any evidence supporting it. See id.

**[*21]** A.     Required Payment

A corporation's payment of its own contractual obligations--even indemnification obligations--is generally an ordinary and necessary payment.  See Union Inv. Co. v. Commissioner, 21 T.C. 659, 663 (1954).  According to Jani-King, the indemnity provisions of its bylaws required it to reimburse Cavanaugh, and therefore the reimbursement was deductible.  We've held, however, that indemnification is not necessarily deductible just because it's contractually required.  See HIE Holdings, Inc. v. Commissioner, T.C. Memo. 2009-130, 2009 WL 1586044, at *104 (citing Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 359 (1971)).[11]

But we don't have to explain very much about the general rule about required reimbursements or its exceptions, because in this case we don't even think the reimbursement was required.  Article 9 of the bylaws requires indemnification of any current or former "Director, officer or employee" of Jani-King for "any and all liability and reasonable expense" stemming from "any claim, action, suit or proceeding"--but only where that person became involved in the controversy "by reason of being or having been such a Director, officer or employee."  It also

---

[11] Since Union Inv. Co. predates Gilmore, it lacks the necessary gloss regarding whether such an indemnification is a "business" as opposed to "personal" expense.

**[*22]** conditions indemnification on the person having acted in "good faith" and in his "reasonable" belief that he acted in accordance with Jani-King's best interests at the time.

If a person meets these requirements, and is "wholly successful" in his defense, he is entitled to indemnification as a "matter of right." If he is only partially successful in the controversy, his indemnification is discretionary upon either the Board's or independent legal counsel's determining that he has otherwise met the remaining standards. Cavanaugh submitted no evidence that either of these determinations was made, hasn't argued that he was "wholly successful" in his defense of the Robinson suit, and didn't explain how he met the remaining requirements for indemnification. Given this lack of proof, we find that Jani-King wasn't required to reimburse Cavanaugh for his portion of the settlement costs, and Union Inv. Co. and similar cases simply don't apply.

B.    Voluntary Payment

Even a taxpayer's voluntary payments may sometimes be deductible, however, if made to protect or promote his business. See Lohrke v. Commissioner, 48 T.C. 679, 684-85 (1967). In Lohrke, a corporation became liable for the costs of a defective product. Id. at 682. The taxpayer agreed to become personally liable  for the losses to protect the business relationship and

**[\*23]** protect the corporation's reputation.  Id.  When the defective product could not be sold, the taxpayer paid customers on behalf of the corporation from his personal accounts.  Id. at 683.  He then deducted the payments under section 162, and we let him do so because his motive was "an appropriate expenditure for the furtherance or promotion of that trade or business."  Id. at 688-89.

Lohrke didn't involve the type of payments Gilmore did--payments of legal expenses and costs.  And Lohrke also didn't involve a corporation's paying the expenses of a shareholder, but rather a shareholder's paying the expenses of his corporation--a distinction that the Fifth Circuit has thought important.  See Jack's Maint. Contractors, Inc. v. Commissioner, 703 F.2d 154, 156 (5th Cir. 1983) (holding Lohrke "inapposite" where corporation paid shareholder's debt), rev'g T.C. Memo. 1981-349.

In Hood v. Commissioner, 115 T.C. 172, 179 (2000), we acknowledged these distinctions and in compliance with the Fifth Circuit's holding in Jack's Maint. Contractors limited Lohrke's application.  In cases where a corporation pays the legal expenses of its "sole or controlling shareholder," we carefully

**[\*24]** examine whether the corporation is paying "the expenses of another unable to do so." Id.[12]

Like the taxpayers in Hood, Cavanaugh and Jani-King have made no such showing here. Cavanaugh ably paid all of the litigation costs and expenses--no surprise since Jani-King paid him no less than $1 million per year in 2005 and 2006 (not counting his $7 million and $16 million distributive shares of Jani-King's profits in 2005 and 2006, respectively). We conclude that Lohrke doesn't apply, and Jani-King cannot deduct the $250,000 payment, because here the taxpayer was more likely than not able to pay for himself.

But this isn't the only reason the payment is nondeductible. Quite apart from Cavanaugh's ability to pay is that Lohrke and Hood don't stand outside of Gilmore's shadow. For a corporation to be able to deduct the payment of another's obligation, that expense must still be a business expense. And where legal expenses or costs are involved, the origin-of-the-claim doctrine still applies.

---

[12] Hood also introduced the concept of the payment of the expense being a "direct and proximate" primary benefit to the corporation, see Hood, 115 T.C. 172, 181 (2000), but in the context of determining whether the payment was a constructive dividend, see id. at 180 ("The crucial test of the existence of a constructive dividend is whether 'the distribution was primarily for the benefit of the shareholder.'" (quoting Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978))).

**[\*25]** In <u>Capital Video Corp. v. Commissioner</u>, 311 F.3d 458 (1st Cir. 2002), <u>aff'g</u> T.C. Memo. 2002-40, a sole shareholder of a porn distributor got messed up with the mob, and started to pay a bimonthly "tribute". <u>Id.</u> at 461. His unsavory associates compounded his problems by bringing the feds down on him: A grand jury eventually indicted him for conspiring to bribe a union official, and defraud the United States, and for transporting obscene materials across state lines using a common carrier. <u>Id.</u> at 461-62. Facing big jail time, he pleaded guilty to one count of conspiring to evade income tax. <u>Id.</u> at 462.

Capital Video, his corporation, paid all his legal fees and costs, and then tried to deduct these expenses. The First Circuit agreed with this Court and the Commissioner that they weren't deductible. Capital Video's reliance on its own business judgment in paying the expenses was not enough; what was necessary was that the "origin of the expense * * * arose in connection with, or proximately resulted from, Capital Video's business activities" and that Capital Video hadn't shown that its shareholder's tax conspiracy was a necessary part of the mob tribute scheme or of Capital Video's business. <u>Id.</u> at 465-66.

Cavanaugh's portion of the settlement arose from his personal, not his business, activities that fateful Thanksgiving holiday. Jani-King's $250,000 deduction also fails under <u>Gilmore</u>.

**[*26]** This would normally be enough, but the Commissioner does make one more argument that's worth some mention. He correctly points out that we noted in <u>Hood</u> that there is often lurking, in cases where a corporation pays the expenses of its controlling shareholder, a question of whether that payment is a nondeductible constructive dividend. <u>Hood</u>, 115 T.C. at 179-82. Relying on <u>Hood</u>, he argues in his brief that we should find Jani-King's $250,000 payment a constructive dividend, and thus nondeductible.

Hood, however, involved a C corporation.[13] Jani-King is an S corporation. Though we understand the Commissioner's desire to draw out another similarity between this case and <u>Hood</u>, constructive dividends are quite complicated in S corporations--the absence of a business purpose for a payment to a stockholder is far from enough. S corporations are flowthrough entities, which means that distributions from them to their shareholders generally aren't taxable as dividends: The Code instead taxes distributions to a shareholder exceeding the basis in his S corporation stock as capital gain if the corporation has not accumulated earnings and profits (E&P). <u>See</u> sec. 1368(b).

---

[13] Under Subchapter C of the Code, the net income of a C corporation is taxed first at the corporate level, and a second time at the individual level when the corporation's shareholders receive distributions of those profits in the form of dividends.

**[\*27]** For an S corporation that does have accumulated earnings and profits, a shareholder distribution is more complicated. The amount of a distribution that exceeds the corporation's accumulated adjustment account (AAA) is a dividend-- but only to the extent it does not exceed the S corporation's accumulated E&P. <u>See</u> sec. 1368(c)(2). The portion of the distribution that doesn't exceed the AAA is taxable only to the extent it is greater than the shareholder's basis in his stock. <u>See</u> sec. 1368(c)(1).

When Jani-King reimbursed Cavanaugh $250,000 in 2005 its reported AAA was nearly $6.4 million. But the Commissioner introduced no evidence of Jani-King's accumulated E&P or Cavanaugh's basis in his Jani-King stock, which leaves us with no grounds to decide if the distribution is a constructive dividend.

**[\*28]** The Commissioner bears the burden of proof on this issue.[14]  The parties

settled numerous other issues, so

Decision will be entered under

Rule 155.

---

[14] He raised this issue for the first time in his brief.  And it's an issue whose proof would require new evidence--whether a constructive dividend exists requires proof of Jani-King's accumulated earnings and profits and Cavanaugh's basis in his Jani-King stock.  This makes it a new "matter", in contrast to a new "theory", which is simply a new argument about existing evidence.  See Hurst v. Commissioner, 124 T.C. 16, 30 (2005).  The party that raises a new matter has the burden of proving it.  The Commissioner still wins on his main point that Jani-King can't deduct the $250,000 that it reimbursed Cavanaugh.